UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HKM ENTERPRISES, INC d/b/a ADAPTIVE LAUNCH SOLUTIONS,<br><br>Plaintiff,<br><br>v.<br><br>PARSONS GOVERNMENT SERVICES, INC., a Nevada corporation, and PARSONS CORPORATION, a Delaware corporation,<br><br>Defendants. | Case No. 2:23-cv-10592-MEMF-PD<br><br>**[PROPOSED] ORDER GRANTING PARSONS GOVERNMENT SERVICES, INC.'S MOTION TO DISMISS [ECF NO. 24]** |

On February 8, 2024, Defendant Parsons Government Services, Inc. ("PGS") filed a motion to dismiss (the "Motion") all claims alleged in Plaintiff HKM Enterprises, Inc., d/b/a Adaptive Launch Solutions' ("ALS") complaint.  This Motion was joined by Parsons Corporation.  ALS opposed the Motion.  Having considered the Motion, as well as ALS' Opposition and all additional filings, the Court hereby rules as follows:

# FACTUAL BACKGROUND[1]

A.  **Initial Discussions Between PGS And ALS Regarding The LMSI Program, And The Parties' Teaming Agreement**

ALS alleges PGS and ALS began discussing the possibility of working together on the U.S. Space Force's Launch Manifest Systems Integrator ("LMSI") program in July 2017. Dkt. 1 ¶ 25. During meetings in June and July 2017, the parties determined PGS had the appropriate contracting vehicle to bid on the LMSI project. *Id.* ¶ 26.

ALS alleges that to memorialize their intention to work towards PGS obtaining the LMSI contract, PGS and ALS entered into a Teaming Agreement, dated January 15, 2018. *Id.* ¶¶ 30–31; Dkt. 8 Ex. A. The Teaming Agreement reflected that PGS "intend[ed] to submit a proposal" regarding a Multi-mission Integration Phases Project and to "engage [ALS] as its proposed subcontractor primarily responsible for the work described in" a "Work Scope" attached to the Teaming Agreement. Dkt. 8 Ex. A at 1 ¶ 1(a). In the attached Work Scope, the parties recognized that the project would involve "Contract Line Item Numbers ('CLINs')" that would only be executed by the government as requirements for additional satellite launches were finalized. *Id.* at 11 ¶ 3. Accordingly, the parties understood that "future CLIN executions will result in the potential variation in available work for either Party during periods of time within the performance of the contract and may result in changes above or below expected workshare participation of any one Party that may not be foreseen at contract award." *Id.* Recognizing this inherent uncertainty in work and workshare allocations, the Teaming Agreement stated the Parties' "intent that the division of tasks or workshare on individual integration efforts [would] be determined based on each Party's core competencies and individual requirements for [a] given launch," and that it was "expected . . . both Parsons and ALS each [would perform] a minimum of 30% of the effort organically" over the life of the contract execution. *Id.* at 11 ¶ 4.

---

[1] Unless otherwise indicated, the following factual background is derived from ALS's Complaint. Dkt. 1. For the purposes of the Motion to Dismiss, the Court treats these factual allegations as true, but at this stage of the litigation, the Court makes no finding on the truth of these allegations and is therefore not—at this stage—finding that they are true.

By its own terms, the Teaming Agreement terminated on the occurrence of any number of events, including (1) PGS's award of a subcontract to ALS or (2) three years from the effective date of the Teaming Agreement. *Id.* at 6–7 ¶¶ 12(b), 12(e).

**B.     PGS Is Awarded The Prime LMSI Contract And The Parties Negotiate The Subcontract**

After the parties entered into the Teaming Agreement, PGS began preparing its bid for the LMSI Contract. ALS contends that, "[t]hroughout 2018," while PGS was developing its proposal, PGS representatives informed ALS "it would be awarded 30% of the total workshare under the LMSI Contract," if PGS was awarded that contract. Dkt. 1 ¶ 36. But ALS's examples do not state as much. For example, ALS alleges that early on in discussions, on October 25, 2018, Richard Waterman of PGS, wrote to ALS indicating he was attempting to demonstrate internally within PGS that ALS could manage the contract volume "***if*** [the Parties] negotiate[d] full 30% ws [workshare]." *Id.* ¶ 39 (emphasis added ). ALS also contends that Mr. Waterman sent another email on December 27, 2018, which had the words "30% labor workshare" next to ALS's name in a "quick summary" put together by PGS's pricing people. *Id* ¶ 41.

PGS submitted its bid for the LMSI Contract on January 7, 2019. *Id.* ¶ 66. PGS was awarded the LMSI Contract on February 7, 2019. *Id.* ¶ 43. Under the "Period of Performance" specified in the LMSI Contract, it was anticipated that the government would submit tasks orders to PGS "through 2Q FY 2023." Dkt. 17-3 at LMSI PWS p. 18, ¶ 2.7.

**C.     The Subcontract And Its Key Provisions**

Following PGS being awarded the LMSI Contract, PGS and ALS began negotiating a subcontract to govern the terms under which ALS would perform work to aid PGS's fulfilment of the LMSI Contract. Dkt. 1 ¶ 45. The Parties entered into a US Domestic Services IDIQ Subcontract Agreement (the Subcontract) with an effective date of February 11, 2019. Dkt. 8 Ex. B at 1. Per its terms, the Subcontract was entered into so PGS could "subcontract a portion of the work to be performed under the [LMSI Contract]" to ALS "in accordance with the terms and provisions of [the] Subcontract." *Id.* at 1 § A-1. The Subcontract contains an integration clause, which notes that the Subcontract, along with its attachments and documents incorporated by reference, constitutes "the entire agreement between [PGS] and [ALS] with regard to the Services and Articles purchased

hereunder" and that the Subcontract superseded "any and all other oral or written representations, inducements, or understandings of any kind or nature between the parties." *Id.* at 20 § H-1.

The Subcontract provided PGS "may issue task orders" to ALS, but PGS expressly was "not obligated to order any amount of work" from ALS and did not "guarantee [ALS] any amount of work under" the Subcontract. *Id.* at 4 § B-1. The Subcontract stated it was the parties' "intent" to award ALS "the workshare percentage described in Section C-1" of the Subcontract, presuming ALS could perform the work. *Id.* Section C-1 of the Subcontract states it was PGS's "intent that ALS [would] receive a minimum of 30% of the effort organically over the life of the LMSI contract," again assuming ALS could perform the work. *Id.* at 8 § C-1. In addition to expressly stating no minimum amounts were guaranteed to ALS, the Subcontract stated, "[a]ny quantities of supplies or services specified in [the] Subcontract [were] estimates only." *Id.* at 4 § B-1.

The Subcontract set forth provisions governing the exchange and creation of any alleged intellectual property in connection with PGS's fulfillment of the LMSI contract. *Id.* at 21–22 § H-8. Specifically, ALS granted PGS an "irrevocable, perpetual, nonexclusive, worldwide, royalty-free right and license to use, execute, reproduce, display, perform, and prepare derivative works based upon" preexisting "inventions, technology, designs, . . . technical information, . . . and other information and materials." *Id.* ALS also granted PGS the "right to authorize others to" use ALS's alleged intellectual property "for the purpose of executing the LMSI prime contract." *Id.*

In various subsections throughout the agreement, the Subcontract references specific portions of the Federal Acquisition Regulation ("FAR"). *E.g.*, *id.* at 2 § A-4, 15 § F-2. Additionally, Attachments 6A and 6B to the Subcontract contain lists of "Flow Downs" from the LMSI Contract, which are specific provisions of the FAR that PGS and ALS agreed to incorporate into the Subcontract. *Id.* at 33 § J, 110–12 (Attachment 6A), 113–20 (Attachment 6B). 48 C.F.R § 16.504 is not among the FAR provisions the Parties incorporated into the Subcontract. Section H-17 of the Subcontract states the agreement "shall be interpreted and enforced in accordance with the law of US Federal Contracts," except that "where the law of US Federal Contracts is not applicable, the law of the state of California will apply." *Id.* at 26 § H-17.

The Subcontract had a base period of one year, from the date of execution to February 6, 2020. *Id.* at 15 § F-1. After the initial year, the Subcontract could be renewed by PGS "in its sole and absolute discretion" for up to four additional 12-month periods. *Id.* Accordingly, in no event would the "Period of Performance" under the Subcontract extend beyond February 6, 2024. *Id.*

### D.     The Parties' Post-Subcontract Conduct

ALS contends the Parties' relationship "functioned as envisioned from 2019 through the first quarter [of] 2022." Dkt. 1 ¶ 50.

Thereafter, however, ALS contends PGS took certain actions with regard to ALS's alleged intellectual property that ALS argues exceeded the scope of the license provided to PGS through the Subcontract. ALS alleges that, in early 2021, PGS supposedly represented it had "retired the development risks" associated with certain of ALS's purported intellectual property, and that PGS made certain references to ALS's intellectual property without attribution. *Id.* ¶ 69. ALS contends that, starting in September 2021, it designed and developed its own "Power Control Module" or "PCM," which supposedly solved certain problems in the performance of the LMSI Contract. *Id.* ¶ 75–76. ALS further alleges that, since at least December 23, 2021, PGS has been offering the PCM for sale on its website. *Id.* ¶¶ 79–80. Finally, ALS argues that, in early 2022, PGS submitted documents to the government that replaced certain references to ALS's intellectual property with references to separate technology owned by PGS. *Id.* ¶¶ 71, 76.

Additionally, ALS contends PGS violated what it claims to be a "guarantee" that ALS would receive 30 percent share of all work received under the LMSI Contract. *Id.* ¶¶ 82, 111–12. For example, ALS asserts that since January 2023, ALS staff have been eliminated at one Parsons' facility. *Id.* ¶ 83. ALS further contends that, per a November 14, 2023 letter from PGS, no further work would be allocated to ALS for the remaining three months of the Subcontract. *Id.* ¶ 84. The actual letter ALS refers to simply informs ALS that the Subcontract between the parties "will expire on 6 February

2024," as the terms of the initial agreement provided, and that "[n]o further options [would] be exercised." *Id.*; Dkt. 17-12.[2]

Finally, ALS contends PGS has not completed certain "Past Performance" evaluations as part of the General Services Administration's process for certifying businesses to perform certain contracts. Dkt. 1 ¶ 90.

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) allows an attack on the pleadings for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. While the Court must accept the factual allegations in the pleadings as true, *Soo Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017), it is "not bound to accept as true a legal conclusion couched as a factual allegation," *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Furthermore, Federal Rule of Civil Procedure 9(b) requires fraud claims to be asserted with particularity. *See* Fed. R. Civ. P. 9(b); *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1179–80 (9th Cir. 2016). Rule 9(b)'s particularity requirement is intended both to ensure that allegations of fraud are "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud" and to "deter the filing of complaints as a pretext for the discovery of unknown wrongs." *United Healthcare*, 848 F.3d at 1180 (internal quotations and citations omitted). To comply with Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud," which means it must allege "the who, what, when, where, and how of the misconduct charged." *Id.* at 1180 (internal quotations and citations omitted).

---

[2] The November 14, 2023 letter is cited in ALS's Complaint and therefore may be considered by the Court on a motion to dismiss. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

**DISCUSSION**

**1.      ALS's Claim for Breach of Contract**

To adequately plead its claim for breach of contract, ALS must allege facts establishing (1) the existence of a contract; (2) ALS's performance or excused nonperformance; (3) PGS's breach; and (4) damages. *Walsh v. W. Valley Mission Cmty. Coll. Dist.*, 66 Cal. App. 4th 1532, 1545 (1998); *see also Greenwich Ins. Co. v. Rodgers*, 729 F. Supp. 2d 1158, 1163 (C.D. Cal. 2010). Under California law, the "interpretation of a written contract is a matter of law for the court even though questions of fact are involved." *Southland Corp. v. Emerald Oil Co.*, 789 F.2d 1441, 1443 (9th Cir. 1986). When the language of a contract is "clear and explicit, and does not involve an absurdity," then the "language of a contract is to govern its interpretation." Cal. Civ. Code § 1638. Moreover, if a contract's terms are unambiguous, a court may interpret the contract without considering extrinsic evidence. *In re Crow Winthrop Operating P'ship*, 241 F.3d 1121, 1124 (9th Cir. 2001).

ALS's claim for breach of contract is based on its contentions that (1) under the Subcontract it was guaranteed a 30 percent workshare of all work PGS completed under the LMSI Contract and (2) PGS exceeded the scope of the license provided to it to use ALS's intellectual property by the Subcontract. Dkt. 1 ¶¶ 97–98. Neither of these claims are adequately pleaded.

To the extent ALS's breach of contract claim is based on its allegation that it was guaranteed 30% workshare under the Subcontract, that claim fails because the Subcontract contains no such guarantee. The clear terms of the Subcontract preclude ALS's claim it was entitled to a 30% workshare. As the parties provided in the Subcontract:

> **Buyer [PGS] is not obligated to order any amount of work nor does Buyer guarantee Seller [ALS] any amount of work under this Subcontract.**

Dkt. 8 Ex. B at 4 § B.1 (emphasis added). When there are unambiguous terms such as this, they rule the day. *See, e.g., Circle Inn Development & Management v. Global Signal Acquisitions IV LLC*, 2022 WL 18585986 at *4–5 (C.D.Cal. June 14, 2022). Because ALS's allegation of breach is inconsistent with PGS's absolute right not to order "any amount of work under [the] Subcontract," its claim for breach fails. Other provisions of the Subcontract bolster this fact. For instance, Section B.1 stated "[a]ny quantities of supplies or services specified in this Subcontract are estimates only." Dkt. 8

Ex. B at 4 § B.1.  Similarly, Section C.1. states that "the division of tasks or workshare on individual integration efforts will be determined based on each Party's core competencies and [the] individual requirements for each launch."  *Id.* at 8 § C.1.  And in Section H.2, the parties made clear that the Subcontract did "not create any employer-employee, agency, joint employer, joint venture or partnership relationship between [PGS] and [ALS]."  *Id.* at 20 § H.2.  This further dispels the notion that ALS was entitled to a defined share of any profits as a partner to PGS.  Thus, by its plain terms, the Subcontract precludes ALS's claim as a matter of law.

To the extent ALS's breach of contract claim is based on PGS's alleged use of ALS's intellectual property beyond the scope of the license provided by the Subcontract, the claim also fails because ALS has not identified any provision of the Subcontract that PGS allegedly breached.  Through the Subcontract, ALS provided PGS a broad license to use its intellectual property:

> [ALS] grants to [PGS] an irrevocable, perpetual, nonexclusive, worldwide, royalty-free right and license to use, execute, reproduce, display, perform, , [*sic*] and prepare derivative works based upon, such work and materials, and the right to authorize others to do any of the foregoing for the purpose of executing the LMSI prime contract.

Dkt. 8 at 21 § H.8.  As an initial matter, ALS complains about a number of events that it fails to allege were unrelated to the execution of the LMSI contract.  Moreover, none of ALS's allegations identify the actual alleged "IP" at issue, or how or where within any PGS materials that "IP" is shown or used.  Instead, ALS just offers mere conclusions, which are insufficient under the law.  *See Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1355 (Fed. Cir. 2021) (affirming that allegations "[did] not plausibly allege infringement" when plaintiff's "allegations [were] conclusory" and "merely track[ed] the claim language"); *see also QuickLogic Corp. v. Konda Techs., Inc.*, 618 F. Supp. 3d 873, 882 (N.D. Cal. 2022) (noting that "a plausible claim [of patent infringement] requires at least some allegations regarding how an accused product satisfies certain claim limitations").

ALS's claim also fails because it has not alleged that PGS breached any provision of the Subcontract with respect to its use of ALS's alleged intellectual property.  The Subcontract license stated what PGS "could do" with ALS's alleged IP; it did not state what ALS "could not do" with that alleged IP.  As a result, a claim by ALS that PGS went beyond the license and did something it "could not do" is **not** a breach of contract claim—it doesn't reflect a violation of a contractual term.  *See San*

*Mateo Union High Sch. Dist. v. Cnty. of San Mateo*, 213 Cal. App. 4th 418, 440 (2013) (affirming dismissal of claim for breach of contract when plaintiffs failed to "alleged that defendants failed to perform . . . duties" set forth in contract); *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087 (9th Cir. 1989) (holding that a licensee whose "use exceeds the scope of its license" thereby "infringes the owner's copyright"). As the case *Macom Technology Solutions Holdings, Inc. v. Infineon Technologies, AG*, 2016 WL 6495373 *22 (C.D. Cal. Oct. 31, 2026), holds:

> licensors are only entitled to a breach of contract remedy when a licensee exceeds the scope of the grant if: (1) there is an express negative covenant not to exceed the scope of the patent license or (2) there is an implied negative covenant arising because the [licensor] provided [the licensee] with confidential technical information or know-how along with the patent license.

Here, the Subcontract does not contain "an express negative covenant not to exceed the scope of the . . . license," and ALS has not alleged that it provided PGS with "confidential technical information or know-how along with the . . . license." ALS's claim in this regard is nothing but conclusions.

Accordingly, ALS's claim for breach of contract is DISMISSED.

**2.  ALS's Claim for Anticipatory Breach**

By definition, an anticipatory breach of contract can happen only before "the time due for performance." *Stephens & Stephens XII, LLC v. Fireman's Fund Ins. Co.*, 231 Cal. App. 4th 1131, 1150 (2014) (denying claim for "repudiation" because insurer's "denial of coverage, coming after the occurrence of the damage for which indemnity was sought, was not a repudiation but instead an ordinary breach by nonperformance"). Here, the Subcontract ended by its own terms on February 6, 2024. *See* Dkt. 8, Ex. B at 15 § F.1; *see also* Dkt. 17-12 (November 14, 2023 letter from PGS to ALS informing ALS that Subcontract "[would] expire on 6 February 2024"). Because the Subcontract has ended and the time for any performance under that agreement has come due, it is not possible that the Subcontract will be breached in the future.

Accordingly, ALS's claim for anticipatory breach is DISMISSED.

**3.  ALS's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing**

To state a claim for breach of the covenant of good faith and fair dealing, ALS must allege facts establishing PGS did something to injure ALS's right to receive the benefits promised under the Subcontract. *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 684 (1988). As a starting point, a claim

for breach of the implied covenant "rests upon the existence of some specific contractual obligation." *Racine & Laramie, Ltd. v. Dep't of Parks & Rec.*, 11 Cal. App. 4th 1026, 1031 (1992), *as modified on denial of reh'g* (1993); *see also Samaan v. Anthem Blue Cross Life & Health Ins. Co.*, 2021 WL 2792307, at *6 (C.D. Cal. Mar. 10, 2021) (dismissing bad faith claim where plaintiff "fail[ed] to allege any specific contractual provisions" the defendant had breached). At the same time, "[i]t is well established in California that a breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself." *Samaan*, 2021 WL 2792307, at *7 (quotations omitted). "If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990).

ALS's bad faith claim is premised on PGS allegedly (1) failing to allocate ALS "at least thirty percent" of the workshare; (2) exceeding the scope of the IP license; and (3) refusing to "fill out 10 Past Performance Evaluation Forms." Dkt. 1 ¶ 119. The first two aspects of ALS's bad faith claim are redundant of its breach of contract claim, and fail for the same reasons stated above. Additionally, a bad faith claim cannot be a mere restatement of a party's breach of contract claim. *See Careau*, 222 Cal. App. 3d at 1395. Because ALS has not identified a "conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement," *id.*, ALS has not adequately alleged its bad faith claim. The third allegations—relating to "Performance Evaluation Forms"—also fails because ALS has not tied that allegation to any "specific contractual obligation[s]" owed by PGS. *Samaan*, 2021 WL 2792307, at *6 (dismissing bad faith claim based on defendant's alleged failure to "properly compensate Plaintiff" where complaint lacked "allegations of the specific contractual provisions that describe[d] the 'proper compensation'").

As a result, ALS's claim for breach of the implied covenant of good faith and fair dealing is DISMISSED.

4.     **ALS's Claim for Fraudulent Inducement**

To plead its claim for fraudulent inducement, ALS must allege facts establishing (1) a misrepresentation by PGS; (2) PGS's knowledge of the falsity at the time of contracting; (3) PGS's intent to defraud ALS; (4) justifiable reliance by ALS; and (5) damages. *Engalla v. Permanente Medical Grp., Inc.*, 15 Cal. 4th 951, 973–74 (1997). To sufficiently allege PGS made a misrepresentation, ALS must establish PGS "made a representation of intent to perform some future action, i.e., the defendant made a promise," and PGS "did not really have that intent at the time that the promise was made, i.e., the promise was false." *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1060 (2012). It is not sufficient merely to show "the alleged promise did not come to fruition." *Stretch Lab Franchise, LLC v. Stretch Lab, LLC*, 2019 WL 2279388, at *2 (C.D. Cal. Mar. 4, 2019). In considering whether a plaintiff has alleged "justifiable reliance," the court can consider presence of an integration clause in the agreement reached by the parties, as the presence of such a clause may make it "simply not justified" for plaintiff to have supposedly relied on an oral representation that is contrary to the text of the parties' contract. *Fischler Kapel Holdings, LLC v. Flavor Producers, LLC*, 2021 WL 2920610, at *9 (C.D. Cal. July 12, 2021).

ALS's claim for fraudulent inducement is based on alleged false representations PGS made regarding what ALS alleges was a guarantee that it would receive a 30% workshare under the Subcontract. Dkt. ¶¶ 110–12.

First, ALS's fraudulent inducement claim fails because it is not pled with specificity as required by Rule 9(b). *See JJ Mktg. Grp. Inc. v. Dr. K in LA Entm't*, 2022 WL 17098185, at *5 (C.D. Cal. Aug. 1, 2022); *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 100 F. Supp. 2d 1086, 1093 (C.D. Cal. 1999). Throughout the Complaint, ALS makes broad allegations that unidentified "representatives" of "Defendants" supposedly "informed ALS it would be awarded 30% of the total workshare under the LMSI Contract" "[t]hroughout 2018." Dkt. 1 ¶ 36; *see also id.* ¶ 54. These allegations lack the particularity required of identifying the specific "who, what, when, where, and how of the misconduct charged." *United Healthcare*, 848 F.3d at 1180.

Second, to the extent ALS does attempt to identify purportedly specific representations, they do not support ALS's premise—that is, that PGS made an affirmative promise ALS would receive

11

30% of the workshare under the LMSI Contract. None of those allegations identify a sufficiently definite promise made by PGS that ALS was guaranteed 30 % of the workshare under the LMSI Contract. *See* Dkt. 1 ¶¶ 38–39, 41, 55–57.

Third, ALS has not pleaded facts sufficient to satisfy *Iqbal* and *Twombly* that PGS had no intent to comply with the alleged promises at the time they were made. A plaintiff suing for fraudulent inducement must allege more than that "the alleged promise did not come to fruition." *Stretch Lab*, 2019 WL 2279388, at *2. ALS has not done that here—ALS does not plead any facts showing PGS did not intend at the time to comply with an alleged promise at the time it was made. In fact, ALS specifically alleges that "the relationship between [PGS] and ALS functioned as envisioned from 2019 through the first quarter of 2022." *Dkt.* 1 ¶ 50.

Finally, ALS has not pleaded facts demonstrating it reasonably relied on any of PGS's alleged representations in entering into the Subcontract. Nor could it, as the Subcontract contains a complete integration cause, which makes clear the Subcontract itself is "the entire agreement between [PGS] and [ALS] with regard to the Services and Articles purchased hereunder" and that the Subcontract superseded "any and all other oral or written representations, inducements, or understandings of any kind or nature between the parties." Dkt. 8 Ex. B at 20 § H-1; *see United Guar. Mortg. Indem. Co. v. Countrywide Fin. Corp.*, 660 F. Supp. 2d 1163, 1189 (C.D. Cal. 2009) (dismissing claim for fraudulent inducement where plaintiff had not pleaded "reasonable reliance" as "judged by an objective standard").

Thus, ALS's claim for fraudulent inducement is DISMISSED.

**5.      ALS's Claim for Violation of California Business and Professions Code section 17200**

California's Unfair Competition Law ("UCL") prohibits unfair competition, which includes any "unlawful, unfair or fraudulent business act[s] or practice[s]." Cal. Bus. & Prof. Code § 17200. To assert a claim under section 17200, a plaintiff must allege facts showing it has standing, which requires establishing (1) it suffered an "injury in fact" and (2) lost money or property as a result of the alleged unfair competition. *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 99 F. Supp. 3d 1110, 1184 (C.D. Cal. 2015); *see also Birdsong v. Apple, Inc.*, 590 F.3d 955, 959–60 (9th Cir. 2009).

Under the UCL, "unlawful," "unfair," and "fraudulent" acts or practices each have their own definitions. *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010). To establish a business practice is unlawful, the plaintiff must establish the defendant's conduct violated some law. *Farmers Ins. Exch. v. Super. Ct.*, 2 Cal. 4th 377, 383 (1992). To establish a business practice is unfair, the plaintiff must establish the defendant engaged in "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999). And to establish a business practice is fraudulent, plaintiff must allege defendant engaged in conduct that is "likely to deceive members of the public," meaning that "a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Nazemi v. Specialized Loan Servicing, LLC*, 637 F. Supp. 3d 856, 863 (C.D. Cal. 2022). Claims brought under the UCL must be pleaded with particularity under Rule 9(b). *Kearns v. Ford Motor Co.*, 567 F. 3d 1120, 1122 (9th Cir. 2009). The plaintiff must also establish a causal "link between [the] defendant's business practice and the alleged harm" the plaintiff claims to have suffered. *In re Firearm Cases*, 126 Cal. App. 4th 959, 981 (2005); *see also Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1349 (2009).

ALS's claim for violation of California's UCL is based on (1) PGS allegedly misrepresenting itself as the owner of ALS's intellectual property to supposedly divert business away from ALS and (2) PGS not completing performance evaluation forms for ALS. Dkt. 1 ¶¶ 124–26.

As an initial matter, ALS's UCL claim fails because ALS has not adequately alleged it has "suffered injury in fact and lost money" as a result of any of these alleged issues. *Almont Ambulatory*, 99 F. Supp. 3d at 1184; *see also Birdsong,* 590 F.3d at 959. While ALS includes a conclusory allegation to this effect, Dkt. 1 ¶ 127, that assertion is not supported by any facts. *See Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136–37 (9th Cir. 2014) (affirming dismissal of UCL claim based on "very general allegation[s]" of harm to competition); *Novobilski v. Specialized Loan Servicing, LLC*, 2022 WL 17218504, at *12 (C.D. Cal. Apr. 22, 2022) (dismissing UCL claim based on "only conclusory allegations as to how [defendant's] conduct significantly harms competition").

Similarly, ALS fails to allege a violation of any of the various UCL prongs. ALS has not identified any "other laws" PGS supposedly violated. *Farmers Ins.*, 2 Cal. 4th at 383. ALS has not identified any conduct by PGS that "threatens an incipient violation of an antitrust law." *Cel-Tech*, 20 Cal. 4th at 187. And ALS has not alleged PGS engaged in conduct "likely to deceive members of the public." *Nazemi*, 637 F. Supp. 3d at 863. Certainly, ALS's allegations do not satisfy Rule 9(b)'s heightened pleading standard. *See Kearns*, 567 F. 3d at 1122.

Finally, as ALS has not adequately pled a sufficient injury or misconduct by PGS, it also has failed to plead a causal connection between PGS's alleged misconduct and whatever injury ALS contends ALS itself has suffered. *Madrid*, 130 Cal. App. 4th at 452. And, even if ALS had pleaded such an injury, ALS has not established that legal remedies—such as damages—would be inadequate to compensate it for that harm, as it must for a UCL claim. Because ALS's UCL claim is based on the same conduct as its other claims, which provide a legal remedy, its UCL claim should be dismissed. *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020); *Nacarino v. KSF Acquisition Corp.*, 642 F. Supp. 3d 1074, 1082–83 (N.D. Cal. 2022); *Banks v. R.C. Bigelow, Inc.*, 536 F. Supp. 3d 640, 649 (C.D. Cal. 2021).

As a result, ALS's claim for violation of the UCL is DISMISSED.

**6.     ALS's Claim for Declaratory Relief**

The statutory basis for declaratory relief is set forth in 28 U.S.C. § 2201, titled "Creation of remedy." As such, many courts have recognized that "declaratory relief" is a remedy, not a standalone claim. *See Warren v. Specialized Loan Servicing, LLC*, 2023 WL 8870573, at *5 (C.D. Cal. Oct. 24, 2023) (recognizing that language in 28 U.S.C. § 2201 "demonstrates that declaratory relief is best considered a remedy, which cannot, on its own, support an action"); *see also Ariyan, Inc. v. Sewage & Water Bd. of New Orleans*, 29 F.4th 226, 232 (5th Cir. 2022) (holding "district court properly declined to hear Plaintiffs' standalone claim to declaratory relief"); *10E, LLC v. Travelers Indem. Co. of Conn.*, 483 F. Supp. 3d 828, 833 (C.D. Cal. 2020) ("Declaratory relief is not a standalone cause of action"); *Lobstein v. Wash. Mut. Mortg. Pass-Through Certs. WMALT Series 2007-OC1*, 2020 WL 5913897, at *4 (C.D. Cal. Aug. 27, 2020) (dismissing plaintiff's standalone claim for declaratory relief). In any event, declaratory relief is only appropriate if there is an "actual controversy" between

the parties. *See Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 396 (9th Cir. 1982); *Owen v. Alfonso*, 2023 WL 6787819, at *3–4 (C.D. Cal. Aug. 18, 2023) (dismissing request for declaratory relief "[b]ecause no actual controversy exist[ed]" between the parties).

ALS's claim for declaratory relief is based on its contention that the Subcontract guaranteed ALS a minimum of 30% of the work needed to complete the LMSI Contract. Dkt. 1 ¶ 129–32. For the reasons stated above, ALS's interpretation of the Subcontract is contrary to the clear language of the agreement. As a result, ALS's claim for declaratory relief is DISMISSED.

### 7. ALS's Claim for Preliminary Injunctive Relief

"Injunctive relief is a remedy and not, in itself, a cause of action." *Biederman v. Nw. Tr. Servs., Inc.*, 2015 WL 3889371, at *2 (C.D. Cal. June 24, 2015); *see also Marcus v. ABC Signature Studios, Inc.*, 279 F. Supp. 3d 1056, 1073 (C.D. Cal. 2017) (granting defendant's motion to dismiss "injunctive relief claim"). Because "preliminary injunctive relief" is not a standalone claim, ALS's seventh cause of action is DISMISSED.

## CONCLUSION

For the above reasons, the Court grants PGS's motion to dismiss. Moreover, because there is no indication that ALS can cure by amendment the errors identified by PGS, the dismissal shall be with prejudice. PGS's motion to dismiss is GRANTED, and ALS's Complaint is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

Dated:

MAAME EWUSI-MENSAH FRIMPONG
United States District Judge