1

2

3

4

5

6

7

8

9

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

10

11

12

13

14

15

16

17

18

19

HKM ENTERPRISES, INC D/B/A ADAPTIVE
LAUNCH SOLUTIONS,

Plaintiff,

v.

PARSONS GOVERNMENT SERVICES, INC.,
A NEVADA CORPORATION AND
PARSONS CORPORATION, AND
DELAWARE CORPORATION,

Defendants.

Case No.: 2:23-cv-10592-MEMF-PD

**ORDER GRANTING IN PART MOTIONS
TO DISMISS [ECF NOS. 24, 25]**

20

21

22

23

24

Before the Court are Motions to Dismiss filed by Defendants Parsons Government Services,
Inc. and Parsons Corporation. *See* ECF Nos. 24, 25. For the reasons stated herein, the Court
GRANTS IN PART each of the Motions to Dismiss.

25 / / /

26 / / /

27 / / /

28 / / /

1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.     **<u>Background</u>**

A.  **Factual Allegations**[1]

Plaintiff HKM Enterprises Inc d/b/a Adaptive Launch Solutions ("ALS") is a business that provides satellite launch integration services. Compl. ¶ 2. Defendants Parsons Government Services, Inc. ("Parsons Government") and Parsons Corporation ("Parsons," or collectively with Parsons Government, "Defendants") are businesses in similar and related industries. *Id.* ¶¶ 3, 4. Parsons Government is a subsidiary of Parsons. *See id.* ¶ 4. Parsons Government and Parsons share an office. *See id.* ¶ 21.

ALS began working with the U.S. Space Force[2] in 2016, as the U.S. Space Force was implementing a program that eventually became known as Launch Manifest System Integrator ("LMSI"). *See id.* ¶ 23. ALS was seeking a partner that ALS believed would assist ALS in winning an LMSI contract. *See id.* Defendants were not aware of the LMSI program at that time. *See id.* ¶ 24. In a June 2017 meeting, ALS met with a Parsons[3] employee Richard Waterman ("Waterman") and discussed the possibility of ALS partnering with Defendants. *See id.* ¶ 25. In this meeting and follow up meeting, ALS and Defendants decided to pursue an LMSI contract together.

Defendants understood early on that their chance at an LMSI contract depended on partnering with ALS. *See id.* ¶ 27. In a January 2018 PowerPoint presentation regarding strategy,

---

[1] The facts stated herein are taken from the allegations in Plaintiff HKM Enterprises In, ECF No. 58 ("Compl."), unless otherwise indicated. For the purposes of this Motion, the Court treats these factual allegations as true, but at this stage of the litigation, the Court makes no finding on the truth of these allegations, and is therefore not—at this stage—finding that they are true.

[2] This work was initially with the U.S. Air Force, and the work transitioned to the U.S. Space Force after the latter's creation in 2019. *See* Compl. ¶ 23. The Court will refer to this as the U.S. Space Force for simplicity.

[3] The Complaint alleges that Waterman is an employee of Parsons. *See id.* ¶ 6. Parsons asserts in its Reply that Waterman is actually an employee of Parsons Government and argues that Exhibit B to the Complaint shows as such, as Exhibit B states that Waterman's address is at Parsons Government. *See* ECF No. 33 at 5 ("Mr. Waterman is an employee of PGS, as Exhibit B to the Complaint shows"); ECF No. 8 at 34 ("Buyer's Program Manager for this Subcontract is Richard Waterman. The Program Manager's contact information is as follows: . . . Email: Richard.Waterman@parsons.com . . . Address: Parsons Government Services, Inc.").

Drawing all inferences in favor of ALS, Waterman's address being at Parsons Government does not negate the possibility that he is a Parsons Employee. Thus, the Court will accept ALS's allegation on this issue as true for the purposes of deciding the instant Motions.

1    Defendants stated that a partnership with ALS would give them "best-in-class" qualifications to win

2    an LMSI contract. *See id.* ¶¶ 29, 30.

3         Parsons Government and ALS executed a "Teaming Agreement" in January 2018. *See id.* ¶¶

4    30, 31; *see also* ECF No. 8 at 3–15. The Teaming Agreement stated that work would be divided

5    based on each party's competencies and relevant requirements, and recognized that there would be

6    "potential variation in available work" between the parties. *See* Compl. ¶ 31. It further stated that

7    "both Parties will play a material role in each MmSIC integration effort with both Parsons and ALS

8    each performing a minimum of 30% of the effort organically over the life of the MmSIC contract

9    execution." *See id.* ¶ 32. The MmSIC program is now the LMSI program. *See id.* ALS relied on this

10   portion of the Teaming Agreement, which it understood to be a promise that ALS would get 30% of

11   workshare, and spent "countless man hours" assisting Defendants in winning an LMSI contract. *See*

12   *id.* ¶ 33. Defendants were aware that ALS devoted significant time and effort to assisting

13   Defendants. *See id.* ¶ 34. Defendants' representatives continued throughout 2018 to inform ALS

14   both orally and in writing that ALS would receive 30% of total workshare if the parties won an

15   LMSI contract. *See id.* ¶ 36. Defendants made these statements because Defendants knew that ALS

16   would not assist without such a promise. *See id.* ¶ 37.

17        In an October 2018 email, Waterman wrote that he needed to convince others that ALS could

18   handle the 30% volume and that it was not a risk to Defendants to negotiate a 30% workshare. *See*

19   *id.* ¶¶ 38, 39. Waterman also noted that ALS had "a fair amount invested in this over 2+ years." *See*

20   *id.* ¶ 40. Waterman sent another email in December 2018 with a table that included ALS's name next

21   to the words "30% labor workshare." *See id.* ¶ 41. The email also noted that the hours would be

22   "spread over most of the missions" and that the 30% workshare was the "aggregate value across the

23   contract." *See id.* ¶ 42.

24        Defendants won an LMSI contract (the "LMSI Contract") in February 2017. *See id.* ¶ 43.

25   Defendants represented in their proposals that they would be relying heavily on ALS' intellectual

26   property and other trade secret information to deliver if they won such a contract. *See id.* ¶ 35.

27   Defendants would not have won this contract absent ALS's assistance because Defendants lacked

28

certain necessary technical know-how and intellectual property, and no other possible subcontract had the know-how and recourses of ALS. *See id.* ¶ 44.

After Defendants won the LMSI Contract, Defendants and ALS needed to negotiate their subcontractor agreement which would become an Indefinite Delivery, Indefinite Quantity ("IDIQ") contract. *See id.* ¶ 45. But the work under the LMSI contract was set to begin while this IDIQ contract was being negotiated. *See id.* ¶ 46. Thus, the parties[4] executed a Letter Subcontractor Agreement, which delineated the parties' obligations under the LMSI Contract until the IDIQ contract was finalized. *See id.* ¶ 47. Under the Letter Subcontractor Agreement, Defendants paid ALS $40,000 to perform work under the LMSI Contract. *See id.* ¶ 48.

On July 1, 2019, the Parsons Government and ALS executed an IDIQ contract (the "IDIQ Contract"). *See id.* ¶ 49; *see also* ECF No. 8 at 17–137. The parties generally worked cooperatively under the IDIQ Contract from July 2019 until the first quarter of 2022, and this work led to four successful launches and the U.S. Space Force awarding additional missions to Defendants. *See id.* ¶ 50.

The IQIQ Contract contains the following paragraph under the header "Estimated Share of Work:"

> It is the Parties intent that that the division of tasks or workshare on individual integration efforts will be determined based on each Party's core competencies and individual requirements for each launch. It is expected that both Parties will play a material role in the overall manifesting for the LMSI Program. Therefore, in accordance with the agreement between the Parties as set forth in the Teaming Agreement and further agreed to herein, it's Parson's intent that ALS will receive a minimum of 30% of the effort organically over the life of the LMSI contract.

*See id.* ¶ 52. A previous draft of this contract had stated that ALS had a "minimum contract" amount of $40,000, which was the amount ALS earned under the Letter Subcontractor Agreement, and ALS requested that this language be edited to make clear that ALS's workshare was not limited in that way. *See id.* ¶¶ 55, 56. The IDIQ Contract also stated that "[Parsons Government] is not obligated to order any amount of work nor does [Parsons Government] guarantee [ALS] any amount of work

---

[4] The complaint does not make clear whether the Letter Subcontractor Agreement was between ALS and Parsons Government or ALS and Parsons (or some combination thereof). See *id.* ¶ 47.

under this Subcontract, [Parsons Government's] intent is to award to [ALS] the workshare percentage described in Section C-1 of this Subcontract." *See* ECF No. 8 at 20.[5] Section C-1 is the section described in the paragraph above. *See* ECF No. 8 at 24.

The IDIQ Contract further states that it "shall be interpreted and enforced in accordance with the law of US Federal Contracts, and where the law of US Federal Contracts is not applicable, the law of the state of California will apply." *See* ECF No. 8 at 42, *see also* Compl. ¶ 59. It also contains a clause stating:

> This Subcontract, including Attachments, contains Federal Acquisition Regulation ("FAR") and agency FAR supplemental clauses that are incorporated either (1) by reference with the same force and effect as if set forth in full text; or (2) in full text. Unless the context of the clause requires otherwise, the term "Contractor" means [ALS], the term "Contract" means [the IDIQ Contract], and the terms "Government," "Contracting Officer," and equivalent phrases mean [Parsons Government] and [Parsons Government's] [IDIQ Contract] Administrator . . . .

*See* ECF No. 48 at 8.

The IDIQ Contract also contains the following integration clause:

> This Subcontract, together with all attachments hereto and all documents incorporated herein by reference, and all written modifications hereto, constitutes the entire agreement between Buyer and Seller with regard to the Services and Articles purchased hereunder. There are no terms, conditions, or provisions, whether oral or written, between the parties hereto, other than those herein contained. This Subcontract supersedes any and all other oral or written representations, inducements, or understandings of any kind or nature between the parties with regard to the items purchased hereunder.

*See* ECF No. 8 at 36; *see also* Compl. ¶ 53.

Under the IDIQ Contract, ALS granted Defendants a license to use ALS's intellectual property "for the purpose of executing the LMSI prime contract." *See* Compl. ¶ 60. The IDIQ also prohibited either party from disclosing each other's confidential or proprietary information to third parties except for the purpose of performing under the IDIQ and with the other party's consent. *See*

---

[5] The Court's understanding is that the IDIQ Contract is an exhibit to the Complaint, and so the Court will refer to it directly in describing relevant facts. ALS filed their Complaint on December 18, 2023 (*see* Compl.) and then filed "Exhibits A and B pertaining to the Complaint" three days later on December 21, 2023. *See* ECF No. 8. The Teaming Agreement is Exhibit A and the IDIQ Contract is Exhibit B. *See id.* The Complaint referenced these exhibits but did not include them in the first instance. *See, e.g.* Compl. ¶ 49 ("A copy of the full executed IDIQ Contract is attached to this Complaint as Exhibit B."). The parties appear agree that these documents should be construed as part of the original complaint.

*id.* ¶ 61. At the start of the relationship in 2018, ALS provided Defendants with a "Data Rights Assertion" document that asserted that ALS owned the following trade secrets: "(1) Aquila Deck (A-Deck) Adapter Designs and Specifications; (2) Aquila Standard Adapter Designs and Specifications; (3) 2.6M Dual-Manifest Adapter Fitting Design and Specifications; (4) Aquila Multi-manifest System Designs." *See id.* ¶ 63. It also claimed ownership over the following patent: Auxiliary Payload Support Systems, Patent Number 8,608,114 ("the '114 Patent"). *See id.* ¶ 64. Defendants never disputed this ownership and represented to the U.S. Space Force in a proposal and a subsequent Flight Critical Items List ("FCIL") that ALS was the owner of these five intellectual property items. *See id.* ¶¶ 65–67. Waterman approved this version of the FCIL. *See id.* ¶ 67.

In 2021, Defendants circulated a document at the National Space Symposium ("NSS") that indicated that Defendants "had retired the development risks on the A-Deck," which was untrue and suggested that Defendants owned ALS's A-Deck intellectual property. *See id.* ¶¶ 68, 69. ALS management expressed concerns to Defendants after this incident. *See id.* ¶ 68.

In 2022, Defendants decided to change the FCIL (see above, a document submitted to the U.S. Space Force), which previously mentioned the '114 Patent and represented that this patent was owned by ALS, to instead mention a "sequencer" purportedly owned by Defendants in its place. *See id.* ¶¶ 70, 71. Parsons's website now states that A-Deck and the '114 Patent, each of which are owned by ALS, are "Parsons Product[s]." *See id.* ¶ 73.

ALS and Defendants detected certain weaknesses in their system architecture for one project and worked from 2019 to 2021 to resolve this. *See id.* ¶¶ 74, 75. ALS invested substantial time to this effort, and developed its own Power Control Module ("PCM") that solved the problem. *See id.* ¶ 75. The PCM was funded, conceived, designed, and tested in its entirety by ALS using ALS funds, and thus ALS's view is that it is an ALS trade secret per the terms of the IDIQ Contract. *See id.* ¶ 76. ALS asserted its view that the PCM was an ALS trade secret in an updated Data Rights Assertion document sent to Defendants in 2021. *See id.* ¶ 78. Despite this, Defendants have been offering the PCM for sale since December 2021, and these sales are not limited to performance of the LMSI contract. *See id.* ¶ 79. Defendants represent to third parties that they own the PCM. *See id.* ¶ 81.

In January of 2021, Defendants began to reduce ALS's workshare by removing ALS staff from LMSI projects. *See id.* ¶¶ 82, 83. In May of 2023, ALS complained of this via a letter invoking the dispute resolution section of the IDIQ Contract. *See id.* ¶ 85. Parsons Government responded that the IDIQ Contract did not contain a "firm commitment" that ALS would receive 30% workshare. *See id.* ¶ 86. The parties met in June of 2023 to discuss this dispute and were unable to resolve it. *See id.* ¶ 87. In November of 2023, Defendants informed ALS that ALS would receive no more work. *See id.* ¶ 84. Thus, Defendants have not given ALS 30% of the total workshare under the LMSI contract. *See id.*

ALS is capable of being certified by GSA as a small business that meets certain preferential requirements. *See id.* ¶ 90. To gain such certification, ALS needs Defendants to fill out "Past Performance Evaluation Forms," and Defendants are aware of this. *See id.* ¶¶ 91, 94. Defendants have refused to fill out the forms since the parties' dispute began, and this may prevent ALS from gaining the certification it seeks. *See id.* ¶¶ 91, 92.

**B.  Procedural History**

ALS filed suit in this Court on December 18, 2023. *See* Compl. ALS brings seven causes of action against Parsons Government and Parsons: (1) breach of contract; (2) anticipatory breach of contract; (3) fraudulent inducement; (4) breach of the covenant of good faith and fair dealing; (5) violation of California Business and Professions Code Section 17200 (Unfair Competition Law or "UCL"); (6) declaratory relief as to the meaning of the IDIQ Contract; and (7) preliminary injunctive relief. *See id.*

ALS applied for a temporary restraining order ("TRO") on January 9, 2024. *See* ECF No. 17. The TRO ALS sought would have prohibited Defendants from: (1) advertising ALS's intellectual property on Defendants' website, (2) selling ALS's intellectual property, (3) transferring ALS's intellectual property, (4) representing to any third party that Defendants own ALS's intellectual property, and (5) using ALS's intellectual property in any way. *See id.* at 2. On February 2, 2024, the Court denied ALS's application for a TRO, finding that ALS had not made the required showing of a "strong likelihood of irreparable harm." *See* ECF No. 22 ("TRO Order").

Parsons Government and Parsons each filed Motions to Dismiss on February 8, 2024. *See* ECF No. 24; ECF No. 24-1 ("Parsons Government's Motion" or "PG Mot."); ECF No. 25; ECF No. 25-1 ("Parsons's Motion," or "P. Mot."). ALS filed oppositions to each Motion on May 2, 2024. *See* ECF No. 30 ("Opposition to Parsons's Motion" or "P. Opp'n"); ECF No. 31 ("Opposition to Parsons Government's Motion" or "PG Opp'n"). Parsons Government and Parsons each filed replies in support of their Motions on June 4, 2024. *See* ECF No. 32 ("PG Reply"); ECF No. 33 ("P. Reply").

The Court set a hearing on this matter for August 8, 2024. *See* ECF No. 35. In advance of the hearing, the Court shared a tentative ruling with the parties via email. The parties emailed the Court in advance of the hearing indicating that they wished to submit to the tentative ruling, and then appeared briefly at the scheduled hearing to state the same.

**II.     <u>Applicable Law</u>**

Federal Rule of Civil Procedure 12(b)(6) allows an attack on the pleadings for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Generally, a court must accept the factual allegations in the pleadings as true and view them in the light most favorable to the plaintiff. *Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017); *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

As a general rule, leave to amend a dismissed complaint should be freely granted unless it is clear the complaint could not be saved by any amendment. Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

1    **III.**   **Discussion**

2        As discussed in further detail below, the Court finds that the Motions should be granted in

3    part. ALS has adequately pleaded its claims against Parsons Government and Parsons for breach of

4    contract (based on use of IP), fraudulent inducement, and breach of the covenant of good faith and

5    fair dealing, but has not adequately pleaded (or otherwise no longer intends to pursue) its claims for

6    breach of contract (based on failure to meet a purported guaranteed minimum 30% workshare)

7    anticipatory breach, violations of the UCL, declaratory relief, and injunctive relief.

8        **A. ALS has sufficiently alleged that Parsons Government and Parsons are alter egos of**
9           **one another.**

10       ALS asserts that at all relevant times, "Parsons Government was the alter ego of Parsons."

11   *See* Compl. ¶ 21. If Parsons Government and Parsons were in fact alter egos then Parsons might be

12   liable for Parsons Government's actions and vice versa. *See S.E.C. v. Hickey*, 322 F.3d 1123, 1128

13   (9th Cir.), *opinion amended on denial of reh'g sub nom. Sec. & Exch. Comm'n v. Hickey*, 335 F.3d

14   834 (9th Cir. 2003*)* ("California law recognizes an alter ego relationship, such that a corporation's

15   liabilities may be imposed on [another]"). The Court finds that ALS has pleaded sufficient facts to

16   proceed on this theory.

17       An alter ego relationship under California law requires two elements: 1) "there is such a

18   unity of interest and ownership that the individuality, or separateness, of the said person and

19   corporation has ceased, and (2) an adherence to the fiction of the separate existence of the

20   corporation would sanction a fraud or promote injustice." *Id.* Courts look at several factors to

21   consider whether entities are alter egos of one another, including:

22       commingling of funds and other assets of the two entities, the holding out by one entity
         that it is liable for the debts of the other, identical equitable ownership in the two entities,
23       use of the same offices and employees, and use of one as a mere shell or conduit for the
         affairs of the other.
24

25   *Sonora Diamond Corp. v. Superior Ct.*, 83 Cal. App. 4th 523, 538 (2000). Court also at times

26   consider "inadequate capitalization, disregard of corporate formalities, [and] lack of segregation of

27   corporate records". *Id.* "No one characteristic governs, but the courts must look at all the

28

1   circumstances to determine whether the doctrine should be applied." *Id.* "Alter ego is an extreme

2   remedy, sparingly used." *Id.*

3        At the motion to dismiss stage, district courts within the Ninth Circuit often apply a "lenient

4   standard" to allegations of alter ego liability, allowing claims to proceed on such a theory where the

5   plaintiff has pleaded, as to the first element, facts regarding only some of the relevant factors. *See*

6   *Parker v. Country Oaks Partners, LLC*, 2023 WL 3149330, *3 (C.D. Cal. Mar. 22, 2023); *see also,*

7   *e.g.*, *Unichappell Music, Inc. v. Modrock Prod., LLC*, 2015 WL 546059, at *4 (C.D. Cal. Feb. 10,

8   2015). In applying this standard, courts reason that defendant corporations may control the key

9   evidence related to alter ego liability, and thus the plaintiff should only be required to plead minimal

10  facts prior to discovery. *See id.* However, courts nevertheless essentially all agree that "[c]onclusory

11  allegations of 'alter ego' status are insufficient to state a viable claim" and "a plaintiff must allege

12  specific facts supporting *both* of the elements of alter ego liability" to state a claim under this theory.

13  *See Parker*, 2023 WL 3149330 at *3 (quoting *Xyience Beverage Co., LLC v. Statewide Beverage*

14  *Co., Inc.*, 2015 WL 13333486, at *5 (C.D. Cal. Sept. 24, 2015)) (emphasis added); *see also Neilson*

15  *v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1117 (C.D. Cal. 2003) (finding that

16  although the plaintiff pleaded facts sufficient for the first element, the plaintiff failed to plead facts

17  as to the second element, and so had not adequately alleged the theory).

18       Here, ALS points to the following facts which it argues are sufficient for a finding of alter

19  ego liability at this stage (*see* P. Opp'n at 4–6): Parsons Government is a subsidiary of Parsons. *See*

20  Compl. ¶ 4. Parsons Government and Parsons share an office. *See id.* ¶ 21. Parsons's[6] employee

21  Waterman was designated project manager under the IDIQ contract, even though Parsons was not

22  itself a party to the contract. *See* ECF No. 8 at 34. Waterman also made representations to ALS

23  which played a role in inducing ALS to enter into agreements with Parsons Government. *See* Compl.

24  ¶¶ 38–42.

25

26

27  ─────────────────

28  [6] The Court understands that Defendants dispute that Waterman is a Parsons employee and assert that he is
    instead a Parsons Government employee. *See* P. Reply at 5. At this stage, the Court is taking ALS's allegation
    on this point as true, for the reasons discussed in a previous footnote. *See supra* n.3.

The Court finds that, drawing all inferences in ALS's favor, the facts pleaded are sufficient to proceed on a theory of alter ego liability. First, as to the unity of ownership element, ALS alleged that Parsons Government is a subsidiary such that there is a complete overlap in beneficial ownership and that Parsons and Parsons Government share an office. *See* Compl. ¶¶ 4, 21. The Court also notes that regardless of whether Waterman is an employee of Parsons or Parsons Government, he appears to have a Parsons email address and a Parsons Government physical address, which, drawing all inferences in ALS's favor, suggests an overlap in employees. *See* ECF No. 8 at 34. The allegations in the complaint can also be read as suggesting that Parsons Government exists as some sort of shell of Parsons for certain of Parsons's business. *See, e.g.*, Compl. ¶¶ 38–42 (contracts with Parsons Government were negotiated by a Parsons employee). These allegations are sufficient as to the first element at this stage. Second, as to the second element, the allegations here suggest that Parsons employees made false representations in order to induce ALS into a contract with Parsons Government, which Parsons Government then breached. *See id.* ¶¶ 33–34. If this is true, it would be unjust to allow Parsons to shield itself from liability by asserting that it is a distinct entity from Parsons Government and it was never a party to the contract. This is sufficient as to the second element. Parsons's arguments otherwise are not persuasive. Parsons argues that there are only conclusory allegations, but does not grapple with the facts described above, or with the low pleading standard at this stage.

In sum, the Court will allow ALS to proceed on its alter ego theory. To be clear—this is not a definitive finding that the two entities are alter egos of each other. ALS will need to later prove this, and Defendants are free to reargue this issue later, including at the summary judgment stage or at trial. Because alter ego is "an extreme remedy, sparingly used," ALS may have difficulty ultimately prevailing on this theory. *See Sonora Diamond*, 83 Cal. App. 4th at 538. But at this stage, ALS's allegations are sufficient.

Because the Court has found that ALS has adequately pleaded that Parsons Government and Parsons are alter egos of one another, the Court may "ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation." *See id.* As applied here, this will result in the Court treating Parsons Government's alleged actions

1   and Parsons's alleged actions as if they were all taken by the same one entity, effectively lumping

2   the two Defendants together for the purpose of analyzing the instant Motions.

3   **B. ALS has not adequately pleaded its claim for breach of contract (first cause of action) based on the failure to award 30% workshare.**

4

5   Defendants argue that ALS's claim for breach of contract cannot be based on Defendants'

6   purported failure to assign ALS a 30% workshare, as Defendants purportedly had no obligation to

7   assign this workshare under the IDIQ Contract. The Court finds that there was no obligation to

8   assign ALS a 30% workshare in the IDIQ Contract.

9   A claim for breach of contract requires: "(1) a contract, (2) plaintiff's performance or excuse

10   for nonperformance, (3) defendant's breach, and (4) damage to plaintiff." *Walsh v. W. Valley*

11   *Mission Cmty. Coll. Dist.*, 66 Cal. App. 4th 1532, 78 Cal. Rptr. 2d 725 (1998). Here, the key

12   question is as to the third element—whether ALS has alleged that Defendants breached the contract.

13   This requires the Court to interpret the contract. Although ALS has literally alleged that "Defendants

14   are in breach of the IDIQ Contract" by failing to assign ALS a 30% workshare, this is a "legal

15   conclusion couched as a factual allegation" which the Court need not accept. *See Iqbal*, 556 U.S. at

16   678. As the IDIQ Contract is part of the Complaint, the Court will analyze it in detail to determine

17   whether the facts alleged constitute a breach.

18   Under California law, the "interpretation of a written contract is a matter of law for the court

19   even though questions of fact are involved." *Southland Corp. v. Emerald Oil Co.*, 789 F.2d 1441,

20   1443 (9th Cir. 1986). A contract should generally be interpreted "to give effect to the mutual

21   intention of the parties as it existed at the time of contracting" so long as this is ascertainable and

22   lawful. *See* Cal. Civ. Code § 1636. For written contracts, this intention should generally be

23   "ascertained from the writing alone, if possible." *See* Cal. Civ. Code § 1639. Interpretation must be

24   reasonable" and courts "should avoid an interpretation which will make a contract 'unusual,

25   extraordinary, harsh, unjust or inequitable." *Southland*, 789 F.2d at 1443.

26   ALS asserts that the IDIQ Contract requires Parsons Government to award at least 30%

27   workshare to ALS. *See* Compl. ¶ 82, PG Opp'n at 8–13. In support of this argument, ALS points to a

28   clause stating that it is "Parsons' intent that ALS will receive a minimum of 30% of the effort

organically over the life of the LMSI contract." *See* Compl. ¶ 52. Defendants argue that this clause is not binding, noting that another clause states that "Parsons Government] is not obligated to order any amount of work nor does [Parsons Government] guarantee [ALS] any amount of work under this Subcontract." *See* ECF No. 8 at 20. Defendants assert that they had no obligation to provide any minimum workshare to ALS. *See* PG Mot. at 5; *see also* PG Reply at 6.

The Court finds that the IDIQ Contract does not require Parsons Government to award ALS 30% of the total workshare as ALS asserts. The Court finds that this meaning is plain from the text of the IDIQ Contract—Parsons Government was "not obligated to order any amount of work" and did not "guarantee [ALS] any amount of work." *See* ECF No. 8 at 20. These words are unambiguous and make plain that the IDIQ Contract does not require Parsons Government to award ALS a 30% workshare or any other specific amount.

The other portions of IDIQ Contract cited by ALS do not suggest any other meaning. As ALS notes, the IDIQ Contract also stated that "it's Parsons' intent that ALS will receive a minimum of 30% of the effort organically over the life of the LMSI contract." *See* Comp. ¶ 52. This term is written in a way that would be atypical of a promise intended to be binding, in that it expresses an "intent" and does not express that a party is *obligated* to do anything. Reading it alongside the other term discussed above, the Court finds that ALS and Parsons Government did not intend at the time of contracting for this to be a binding promise that ALS would be guaranteed to receive a 30% workshare. *See* Cal. Civ. Code § 1636 (contracts should be interpreted to give effect to the mutual intention of the parties as it existed at the time of contracting); Cal. Civ. Code § 1639 (parties' intention should be ascertained from the writing alone where possible). This interpretation of the IDIQ Contract is further supported by another sentence from the same paragraph: "It is the Parties['] intent that that the division of tasks or workshare on individual integration efforts will be determined based on each Party's core competencies and individual requirements for each launch." *See* ECF No. 8 at 24. This supports the reading that the 30% expectation was not a firm commitment to a specific workshare, as the workshare would be dependent on details that appear to have been uncertain at the time of contracting.

The references to the Teaming Agreement also do not suggest otherwise. ALS notes that the IDIQ Contract states "in accordance with the agreement between the Parties as set forth in the Teaming Agreement and further agreed to herein," immediately before the provision above regarding a 30% expected workshare, and argues (1) that the teaming agreement is incorporated by reference and (2) reading the IDIQ Contract in light of the Teaming Agreement leads to a conclusion that the IDIQ Contract contains a guaranteed minimum 30% workshare. *See* PG Opp'n at 9. Defendants dispute that the teaming agreement was incorporated at all and dispute the impact it would have it if were. *See* PG Reply at 4. The Court need not settle whether the Teaming Agreement was incorporated, as even it were, it does not support a guaranteed workshare. The Teaming Agreement states in relevant part: "It is expected that both Parties will play a material role in each MmSIC integration effort with both Parsons and ALS each performing a minimum of 30% of the effort organically over the life of theMm SIC contract execution." *See* ECF No. 8 at 13. Like the IDIQ Contract, this describes an *expectation*, not a *binding obligation*. Reading all of these together, the Court's finding is that the parties did not intend to contract for a guaranteed minimum 30% workshare in the IDIQ Contract.[7]

ALS's arguments based on the Federal Acquisition Regulations ("FAR") also do not persuade the Court that there was any specific guaranteed minimum workshare. ALS argues that the FAR generally prohibits indefinite supply, indefinite quantity contracts between the government and contractors that do not have some minimum amount, that the regulation prohibiting this was incorporated into the IDIQ Contract, and that based on other language in the contract the regulation should be read to prohibit a contract without a specified minimum between ALS and Parsons Government here.

---

[7] The Court makes no finding on whether the IDIQ Contract (or the Teaming Agreement) created an obligation to give ALS some unspecified amount of work or to determine ALS's amount of work in good faith. ALS pleaded its breach of contract claim based on Defendants' "fail[ure] to meet the 30% workshare requirement," and ALS has not argued that any other theory would support a breach of contract claim. *See* Compl.; *see also* PG Opp'n. The Court's finding is only that there is no 30% workshare requirement in the IDIQ.

First, the Court finds that the FAR as a whole is incorporated into the contract. The IDIQ Contract is, per its text, to be "interpreted and enforced in accordance with the law of US Federal Contracts, and where the law of US Federal Contracts is not applicable, the law of the state of California will apply." *See* ECF No. 8 at 42. The Ninth Circuit addressed a very similar clause and held the contract was governed by FAR. *See Sulzer Bingham Pumps, Inc. v. Lockheed Missiles & Space Co.*, 947 F.2d 1362, 1365 (9th Cir. 1991). In *Sulzer*, the relevant clause stated that the contract would be "governed by and construed in accordance with the law of U.S. Government contracts . . . To the extent that the law referred to in the foregoing sentence is not determinative of an issue arising out of the clauses of this subcontract [California law shall govern]." *Id.* The court considered and rejected defendant's argument that the clause did not incorporate the FAR. *See id.* That clause is functionally identical to the clause at issue here—in both cases, the contract makes clear that federal law of contract shall govern, and California law will fill in any gaps. *See id.* Defendants attempt to argue that there is a distinction in that "not applicable" at issue here is distinct from "not determinative" in *Sulzer*, but this is a distinction without any difference. *See* Mot. at 11 n.5. *Sulzer* controls here, and therefore the clause above results in the FAR being incorporated into the IDIQ Contract and governing the interpretation of the contract.

The FAR does not generally allow the government to enter into an indefinite quantity contract without at least some minimum. *See* 48 C.F.R. § 16.504 ("FAR 16.504"). Where the government enters into indefinite quantity contracts, the "contract must require the Government to order and the contractor to furnish at least a stated minimum quantity of supplies or services." *See id.* A provision of the IDIQ Contract states that in interpreting FAR provisions that are incorporated by reference or quoted in full text, "the term 'Contractor" means [ALS]" and "Government," means Parsons Government. *See* ECF No. 48 at 8. ALS argues that this clause changes the meaning of FAR 16.504, and that FAR 16.504 should be read here as stating that the IDIQ Contract must require Parsons Government to order and ALS to furnish at least a stated minimum quantity of supplies or services.

The Court is not persuaded that FAR 16.504 operates here in the way that ALS asserts it should. ALS provides no authority its argument that if the IDIQ Contract's plain text violated FAR

1    then the Court must rewrite the contract to comply with the FAR. *Sulzer* did not address this

2    situation. In *Sulzer*, the Court found that the FAR as whole was incorporated, but then used this to

3    incorporate an additional obligation plainly stated in the FAR and apply it to one party. *See Sulzer*,

4    947 F.2d at 1365 (incorporating into contract an obligation to take certain steps if a "bidding mistake

5    is suspected," based on the procedure outlined in FAR). Here, on the other hand, ALS seeks to use

6    an obligation listed in FAR (that contracts must have minimums) to impose a specific and different

7    obligation onto Parsons Government (that the IDIQ Contract has a minimum of 30% workshare

8    specifically). It is far from clear to the Court that this rewriting of the IDIQ Contract to make it

9    comply with FAR is appropriate, and ALS has not shown that it is. The Court finds that the parties'

10   intent in contracting was not to impose an obligation of 30% workshare specifically, and the Court

11   finds no support in FAR for a finding that the Court should impose this specific obligation.

12          The Motions are GRANTED as to breach of contract cause of action to the extent it is based

13   on an alleged failure to meet a purported 30% minimum workshare requirement which the Court

14   finds did not exist in the IDIQ. Dismissal shall be with leave to amend, as it is not clear that this

15   claim cannot be saved by any amendment. *See Manzarek*, 519 F.3d at 1031.

16          **C.  ALS adequately pleaded its claim for breach of contract (first cause of action) based**
17          **on the misuse of its intellectual property.**

18          Defendants next argue that ALS has not adequately pleaded any breach of contract based on

19   the allegations that Defendants used ALS's intellectual property in ways that ALS had not consented

20   to. The Court finds that ALS has adequately pleaded its claims.

21          First, Defendants argue that ALS has not adequately alleged any use of ALS's intellectual

22   property beyond that allowed by the IDIQ Agreement. *See* PG Mot. at 11–12. The Court finds

23   otherwise. The IDIQ Contract stated that Parsons Government could use some intellectual property

24   belong to ALS "for the purpose of executing the LMSI prime contract." *See* Compl. ¶ 60. At

25   minimum, ALS alleged that Defendants are offering the PCM for sale to customers unrelated to the

26

27

28

1  execution of the LMSI Contract. *See* Compl. ¶ 79. ALS has pleaded that its intellectual property is

2  being misused in ways the IDIQ contract did not authorize.[8]

3      Second, Defendants argue that IDIQ Contract does not actually *prohibit* using the intellectual

4  property as alleged. *See* PG Mot. at 12. While the IDIQ Contract only allows use of ALS intellectual

5  property for the purpose of executing the LMSI contract, the IDIQ Contract did not contain any

6  clause specifically stating that Defendants could not use ALS's intellectual property in other ways.

7  *See* ECF No. 8 at 17–137. Both parties cited to *Macom Technology Solutions Holdings, Inc. v.*

8  *Infineon Technologies, AG*, a non-binding case which held that a licensor may sue for breach of

9  contract if a licensee exceeds the scope of a license in two circumstances: (1) "the agreement

10  contains an express negative covenant by the licensee not to act beyond the license," or (2) "a

11  licensor provided the licensee with confidential technical information or know-how along with the

12  patent license, such that a court implies a negative covenant." *Macom Tech. Sols. Holdings, Inc. v.*

13  *Infineon Techs. AG*, 2016 WL 6495373, *22 (C.D. Cal. Oct. 31, 2016), *aff'd in relevant part*, 881

14  F.3d 1323 (Fed. Cir. 2018). Here, drawing all inferences in favor of ALS, ALS alleged that it

15  provided Defendants with technical know-how and confidential information alongside its intellectual

16  property. *See* Compl. ¶¶ 44 (Defendants contracted with ALS because ALS had critical know-how),

17  77 (ALS provided its confidential PCM knowledge to Parsons). The Court will follow the same

18  approach as the *Macom* court in reading the IDIQ Contract—the Court finds that in context, ALS

19  has adequately alleged that there is an implied negative covenant regarding use of ALS's intellectual

20  property. Thus, the IDIQ Contract prohibits the alleged misuse.

21      Defendants also cite to *S.O.S., Inc. v. Payday, Inc.*, which held that a "licensee infringes the

22  owner's copyright if its use exceeds the scope of its license." *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d

23  1081, 1087 (9th Cir. 1989). Defendants use this to suggest no suit for breach of contract can lie

24  where a license is exceeded. *See* PG Mot. at 13. But this is not what *S.O.S.* considered or held,

25  rather, *S.O.S.* considered whether a licensor could sue for copyright infringement and held that it

26

27

28  _____

[8] The Court will not parse out each specific piece of intellectual property at this stage.

could. *See S.O.S.*, 886 F.2d at 1087. Nothing in *S.O.S.* suggests that a licensor cannot also sue for breach of contract.

For these reasons, the Motions are DENIED as to breach of contract cause of action to the extent it is based on misuse of intellectual property.

**D. ALS concedes that it no longer intends to pursue its claim for anticipatory breach (second cause of action).**

In response to Defendants' argument that the claim was improper, ALS concedes that it does not intend to pursue its claim for anticipatory breach. *See* PG Opp'n at 5 n.1. Accordingly, the Motions are GRANTED as to the second cause of action for anticipatory breach. This claim will be dismissed without leave to amend.

**E. ALS adequately pleaded its claim for fraudulent inducement (third cause of action).**

Defendants argue that ALS's claim for fraudulent inducement is not properly pleaded. The Court finds that ALS adequately has pleaded this claim.

A claim for fraudulent inducement requires the following elements: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e. to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 917 (1997). Moreover, Federal Rule of Civil Procedure 9(b) states that an allegation of "fraud or mistake must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Specifically, the "circumstances" required by Rule 9(b) are the "who, what, when, where, and how" of the fraudulent activity. *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). Here, Defendants argue ALS failed to plead a misrepresentation with requisite specificity, failed to allege scienter, and failed to allege reliance.

ALS has pleaded that at least one misrepresentation was made. ALS points to a December 2018 email from Waterman, in which he stated that "attached is a quick summary that our pricing people are using to create the table that is required in the price volume" and wrote "30% labor workshare" next to ALS. *See* Compl. ¶ 41. Waterman went on to allegedly explain that Defendants were proposing to the U.S. Space Force that ALS would receive a 30% workshare. *See* Compl. ¶ 42.

In sum, Waterman represented to ALS that Defendants intended to propose to the U.S. Space Force that ALS would receive 30% workshare, which ALS could reasonably read as a promise to actually give ALS 30% workshare. And ALS has alleged this misrepresentation with specificity, nothing who made it (Waterman), when it was made (December 27, 2018), and how (via email). This is sufficient for Rule 9(b).

ALS has also alleged scienter, in that ALS has alleged that Waterman knew the statement was false when he made it. ALS alleges that Defendants' current position is that they were never obligated to actually give ALS a 30% workshare, which supports a reasonable inference that when Waterman made the statement above, he did not intend to follow through on is commitment to give ALS a 30% workshare. *See* Compl. ¶¶ 86–90.

Finally, ALS has also pleaded reliance. ALS alleges that it relied on Defendants' statements regarding 30% workshare and chose to spend man hours and pursue the LMSI contract with Defendants. *See* Compl. ¶ 33. Although ALS does not specifically allege that it relied on statements in entering the IDIQ contract, this is a reasonable inference to draw in ALS's favor from the facts alleged.

Thus, the Motions are DENIED as to the third cause of action for fraudulent inducement.

**F. ALS adequately pleaded its claim for breach of the covenant of good faith and fair dealing (fourth cause of action).**

Defendants argue that ALS's claim for breach of the covenant of good faith and fair dealing fails and discussed three different possible theories. *See* PG Mot. at 14–15. ALS concedes that two of the theories are improper but argues that one theory is a validly pleaded basis for a claim: that Defendants allegedly refused to fill out Past Performance Evaluation Forms. *See* PG Opp'n at 19. The Court finds that the claim is adequately pleaded based upon this theory.[9]

---

[9] The Court understands that ALS abandoned some other theories because ALS sought to argue that these theories amounted to breach of contract, and ALS conceded that this claim could not be based on the same facts as the breach of contract claim. *See* PG Opp'n at 19. Should ALS wish to amend this claim based on the Court's guidance as to the breach of contract issues, ALS is granted leave to do so.

A claim for a breach of the covenant of good faith and faith "rests upon the existence of some specific contractual obligation." *Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1031 (1992). "The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract." *Id.* "In essence, the covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." *Id.* In analyzing whether a purported breach of this duty is actually a breach, courts examine whether some express term of the contract would be frustrated by the alleged conduct.

Here, Defendants argue that there is no specific contractual term that was frustrated by Defendants' alleged failure to fill out Past Performance Evaluation Forms. But, as ALS notes, there is a FAR provision that requires that these Past Performance Evaluation Forms "be prepared at least annually and at the time the work under a contract or order is completed." *See* 48 C.F.R. § 42.1502. As discussed above, the Court found the entire FAR incorporated by reference into the contract. Defendants' only response to this argument is that this provision was not incorporated in, but Defendants do not attempt to argue that if incorporated, it would not result in an obligation to fill out the Past Performance Evaluation Forms. Accordingly, the Court finds that Defendants had such an obligation and that the alleged unjustified delay in doing so can be construed as a breach of the covenant of good faith and fair dealing. The Motions are therefore DENIED as to this cause of action.

**G. ALS has not adequately pleaded its UCL claim (fifth cause of action).**

Defendants raise several arguments as to why the UCL claim should fail. Among others, Defendants argue that ALS lacks standing to bring its UCL claim as ALS has not alleged that it suffered damages from the conduct that forms the basis for this claim. *See* PG Mot. at 18. ALS failed to address this argument, and the Court finds that ALS's claims fall short.

"To have standing under California's UCL, [in its current form], plaintiffs must establish that they (1) suffered an injury in fact and (2) lost money or property as a result of the unfair competition." *Birdsong v. Apple, Inc.*, 590 F.3d 955, 959 (9th Cir. 2009). ALS pointed to alleged

conduct in arguing that this claim should survive, but none of this conduct is alleged to have caused any actual injury. ALS notes that Defendants are allegedly selling ALS's products on their website, but ALS does not allege that it lost any sales or has suffered any diminution of goodwill. *See* Compl. ¶¶ 79–81. ALS has not attempted to argue that it has such standing, and the Court finds ALS does not have standing for a UCL claim based on the allegations as pleaded.

The Motions are therefore GRANTED as to this cause of action. The UCL claim will be dismissed. Because amendment potentially could cure this issue, dismissal will be with leave to amend. *See Manzarek*, 519 F.3d at 1031.

### H. ALS has not adequately pleaded its declaratory relief claim (sixth cause of action).

ALS seeks a judicial determination that the IDIQ Contract contains a 30% minimum guaranteed workshare. In light of the Court's finding that the IDIQ Contract does not contain a 30% minimum guaranteed workshare, this claim fails.[10] For a court to consider a claim for declaratory relief there must be an "actual controversy" between the parties. *See Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393 (9th Cir. 1982). There is no longer any active controversy between the parties in light of the Court's ruling. To the extent that there was a dispute as to the specific form of relief that ALS sought in the Complaint as pleaded, that dispute is now resolved. Thus, the Motions are GRANTED as to the claim for declaratory relief. This will be with leave to amend, as ALS may seek to amend and pursue declaratory relief on some reframed issue regarding the meaning of the contract. *See Manzarek*, 519 F.3d at 1031.

### I. ALS appears to have abandoned its claim for injunctive relief (seventh cause of action).

Defendants argue that the cause of action for injunctive relief is improper and should be dismissed. *See* PG Mot. at 20. ALS did not respond to this argument at all. The Court therefore understands that ALS has abandoned this claim. The Motions are GRANTED as to the claim for injunctive relief. This cause of action shall be dismissed without leave to amend.

---

[10] The Court need not reach the arguments as to whether it is proper to bring this as a "standalone claim." *See* PG Mot. at 19.

**IV.**     <u>**Conclusion**</u>

For the reasons stated herein, the Court ORDERS as follows:

1.   The two Motions to Dismiss (ECF No. 24, 25) are GRANTED IN PART.

    a.   The following claims are DISMISSED WITH LEAVE TO AMEND:

        i.   ALS's breach of contract claim (first cause of action) against Parsons and Parsons Government to the extent it is based on a failure to meet a purported 30% minimum workshare requirement;

        ii.   ALS's UCL claims (fifth cause of action) against Parsons and Parsons Government; and

        iii.   ALS's claim for declaratory relief (sixth cause of action).

    b.   The following claims are DISMISSED WITHOUT LEAVE TO AMEND:

        i.   ALS's claim for anticipatory breach (second cause of action) against Parsons and Parsons Government; and

        ii.   ALS's claim for injunctive relief (seventh cause of action) against Parsons and Parsons Government.

    c.   ALS's other claims against Parsons and Parsons Government may proceed.

2.   ALS is granted leave to file an amended complaint within thirty (30) days of this Order.

Dated: August 9, 2024

_____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge