O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HKM ENTERPRISES, INC D/B/A ADAPTIVE LAUNCH SOLUTIONS,

Plaintiff,

v.

PARSONS GOVERNMENT SERVICES, INC., A NEVADA CORPORATION AND PARSONS CORPORATION, AND DELAWARE CORPORATION,

Defendants.

Case No.: 2:23-cv-10592-MEMF-PD

**ORDER GRANTING IN PART MOTION TO DISMISS [ECF NO. 46]**

Before the Court are the Motions to Dismiss filed by Defendants Parsons Government Services, Inc. and Parsons Corporation. ECF No. 46. For the reasons stated herein, the Court GRANTS IN PART the Motions to Dismiss. ALS is ORDERED to file a trade secret information statement prior to filing an amended complaint, and the Court will issue a separate Order detailing what should be included in the statement.

/ / /

/ / /

/ / /

1  **I.    Background**

2      The Court has already discussed the background of this case at length in its Order Granting in

3  Part Motions to Dismiss. *See* ECF No. 41 ("MTD Order"). The Court will discuss only the

4  procedural background in this Order.[1]

5      **A. Procedural History**

6      Plaintiff HKM Enterprises Inc. d/b/a Adaptive Launch Solutions ("ALS") filed suit in this

7  Court on December 18, 2023. *See* ECF No. 1 ("Complaint"). ALS brought seven causes of action

8  against Parsons Government Services, Inc. ("Parsons Government") and Parsons Corporation

9  ("Parsons"; together with Parsons Government, "Defendants"): (1) breach of contract; (2)

10  anticipatory breach of contract; (3) fraudulent inducement; (4) breach of the covenant of good faith

11  and fair dealing; (5) violation of California Business and Professions Code Section 17200 (Unfair

12  Competition Law or "UCL"); (6) declaratory relief as to the meaning of the IDIQ Contract; and (7)

13  preliminary injunctive relief. *See generally id.*

14      Defendants each filed a motion to dismiss on February 8, 2024. ECF No. 24; ECF No. 24-1;

15  ECF No. 25; ECF No. 25-1. The Court granted in part and denied in part the motions to dismiss.

16  MTD Order. The Court granted ALS leave to file an amended complaint. *Id.* at 22.

17      On September 9, 2024, ALS filed the FAC. FAC. The FAC alleges nine causes of action,

18  some of which are new: (1) breach of contract; (2) breach of implied joint venture/partnership

19  agreement, (3) fraud; (4) breach of the covenant of good faith; (5) violation of the UCL; (6)

20  declaratory relief[2]; (7) misappropriation of trade secrets in violation of the California Uniform Trade

21  Secrets Act; (8) misappropriation of trade secrets in violation of the Defend Trade Secrets Act; and

22  (9) unjust enrichment. *See generally* FAC.

23

24

---

25  [1] This Order states facts taken from the allegations in Plaintiff HKM Enterprises Inc.'s First Amended

26  Complaint, ECF No. 42 ("FAC"), unless otherwise indicated. For the purposes of this Order, the Court treats the factual allegations in the FAC as true, but at this stage of the litigation, the Court makes no finding on the

27  truth of these allegations, and is therefore not—at this stage—finding that they are true.

28  [2] ALS seeks declaratory relief only as to whether the Indefinite Delivery, Indefinite Quantity Subcontract Contract ("IDIQ Contract") guarantees a 30% workshare. *See* FAC ¶ 155–63.

On October 23, 2024, Defendants filed a motion to dismiss the FAC. ECF No. 46; ECF No. 46-1 ("Motion"). The Motion includes a request for judicial notice. ECF No. 46-2 ("RJN"). The Motion is fully briefed. ECF Nos. 47 ("Opposition"), 48 ("Reply").

The Court heard this matter on February 13, 2025.

## II.    Applicable Law

Federal Rule of Civil Procedure 12(b)(6) allows an attack on the pleadings for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Generally, a court must accept the factual allegations in the pleadings as true and view them in the light most favorable to the plaintiff. *Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017); *Lee v. City of L.A.*, 250 F.3d 668, 679 (9th Cir. 2001). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

As a general rule, leave to amend a dismissed complaint should be freely granted unless it is clear the complaint could not be saved by any amendment. *See* Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

## REQUEST FOR JUDICIAL NOTICE

## I.    Applicable Law

"[A] court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). While "undisputed matters of public record" are judicially noticeable, a court may not take

notice of disputed facts in public records. *Lee*, 250 F.3d at 689; *see also MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

Courts in this district have routinely granted requests for judicial notice as to the U.S. Copyright Office's Public Records Catalogue. *See, e.g., Evans v. NBCUniversal Media, LLC*, No. CV 21-0984-CBM-PD(x), 2021 WL 4513624, at *2  (C.D. Cal. July 23, 2021) (granting judicial notice of the presence of movie title in USCO Public Catalogue); *Fisher v. Nissel*, No. CV 21-5839-CBM-(KSx), 2022 WL 16961479, at *3–4 (C.D. Cal. Aug. 15, 2022) (granting judicial notice as to multiple printouts from the USCO's Public Records Catalogue).

## II.     Discussion

Defendants introduce a copy of the United States Patent No. 8,608,114, dated December 17, 2013, which they obtained through the United States Patent and Trademark Office's Patent Public Search Basic. *See* ECF No. 46-3 (Declaration of James L. Zeleney in support of the RJN). Because the patent satisfies the requirements under Federal Rule of Evidence 201(b) and ALS does not oppose the RJN, the Court takes judicial notice thereof. The Request for Judicial Notice is GRANTED.

# MOTION TO DISMISS

## I.     Discussion

As discussed in further detail below, the Court GRANTS IN PART the Motion. ALS has adequately pleaded its claims for fraud. ALS, however, has not sufficiently alleged its claims for breach of contract, breach of implied joint venture/partnership agreement, breach of the covenant of good faith and fair dealing, violation of the UCL, misappropriation of trade secrets under the California Uniform Trade Secrets Act ("CUTSA") and the federal Defend Trade Secrets Act ("DTSA"), declaratory relief, and unjust enrichment. The Court grants leave to amend and cure the defects identified below.

### A.  ALS Has Not Adequately Pleaded Its Claim for Breach of Contract (First Cause of Action).

ALS alleges the following three purported breaches of contract in its breach of contract claim: (1) failure to award 30% workshare as required, FAC ¶¶ 107–17, 119; (2) misuse of ALS's

intellectual property beyond the scope of the licensing agreement, *id.* ¶ 118; and (3) disclosure of confidential material in breach of the confidentiality provision of the IDIQ Contract, *id.* ¶ 120. The Court evaluates each alleged breach and finds that ALS has not sufficiently alleged a breach of contract claim.

         **i.**    **ALS Has Not Adequately Pleaded Its Claim for Breach of Contract Based on the 30% Workshare Provision.**

In its prior Order, the Court found that there "was no obligation to assign ALS a 30% workshare in the IDIQ Contract." MTD Order at 12. ALS's amendments do not change the Court's prior finding, and therefore this alleged ground for breach fails.

As it did previously, ALS alleges that the IDIQ Contract requires Defendants to award at least 30% workshare to ALS. *See* FAC ¶ 64. In its prior Order, this Court found that it is "plain from the text of the IDIQ Contract—Parsons Government was 'not obligated to order any amount of work' and did not 'guarantee [ALS] any amount of work.' . . . These words are unambiguous and make plain that the IDIQ Contract does not require Parsons Government to award ALS a 30% workshare or any other specific amount."[3] MTD Order at 13. In what appears to be an effort to introduce extrinsic evidence and therefore plead around the Court's finding that the workshare provision is unambiguous, ALS now alleges that "Defendants inserted ambiguity and conflict into the IDIQ Contract." FAC ¶ 109; *see id.* ¶¶ 107–16, 119 (additional allegations under the claim for breach of contract).

The Court again finds that the IDIQ Contract does not require Defendants to award ALS 30% of the total workshare as ALS asserts and that ALS has not sufficiently alleged facts to find otherwise. As before, the text of the IDIQ Contract is plain: Defendants were "not obligated to order any amount of work" and did not "guarantee [ALS] any amount of work." *See* ECF No. 42-2 at 5.[4]

---

[3] In the MTD Order, the Court found that ALS sufficiently alleged that Parsons Government and Parsons are alter egos of one another. MTD Order at 9. As such, when the Court refers to its findings in the MTD Order regarding Parsons Government or Parsons, it shall be understood as findings as to both Parsons Government and Parsons, i.e., Defendants.

[4] Whenever the Court refers to the IDIQ Contract, ECF No. 42-2, the Court cites to the page number generated by the CM/ECF system, not to the page number inherent in the document.

ALS's new allegations are relevant only as extrinsic evidence. For instance, although ALS alleges

that the parties mutually intended ALS to receive at least 30% of the workshare, ALS alleges that

this mutuality was "established in *discussions*." *See* FAC ¶ 108 (emphasis added). Likewise,

allegations that concern Defendants' revisions *prior to* the execution of the IDIQ Contract or what

was said *during negotiations* are also extrinsic evidence. *See id*. ¶ 110–11, 116. Insofar as these

newly supplied allegations are extrinsic evidence, they are irrelevant to consider when the contract

itself is unambiguous. *See* Cal. Civ. Code § 1638 ("The language of a contract is to govern its

interpretation, if the language is clear and explicit, and does not involve an absurdity.").

ALS also alleges that Defendants "inserted ambiguity" into the IDIQ Contract, *id*. ¶ 109, but

this allegation is insufficient to establish ambiguity. ALS cannot allege ambiguity just by stating that

ambiguity exists—this is a "legal conclusion couched as a factual allegation," which the Court need

not accept. *See Iqbal*, 556 U.S. at 678. Moreover, any form of negotiations between the parties

*before* the execution of the IDIQ Contract is also extrinsic evidence.

For the first time and through its Opposition, ALS argues that the IDIQ Contract contains

another ambiguous phrase: "organically over the life of the LMSI contract." Opp'n at 10 (citing FAC

¶¶ 57, 111). But this argument is inapposite, because the FAC itself does not allege that this phrase is

ambiguous. At best, the two paragraphs of the FAC that ALS cites in its Opposition include the

phrase only because it is part of the IDIQ Contract's workshare provision. *See* FAC ¶¶ 57, 111

(quoting the IDIQ Contract's workshare provision); ECF No. 42-2 at 9 (workshare provision).

Because the FAC does not allege ambiguity based on the phrase "organically over the life of the

LMSI contract," the Court finds that ALS's argument fails. (And even if it did, this would not

change the Court's reading of the plain language of the contract.)

ALS advances another new argument that if the Court finds the 30% workshare provision

unambiguous, the IDIQ Contract would be rendered "illegal" and "void" for lack of consideration.

Opp'n at 6–7. But this contract formation-based argument is unavailing.[5] There was consideration;

---

[5] Defendants argue that ALS's argument based on consideration was "rejected before." Mot. at 1 (citing MTD Order at 13). The Court, however, did not consider formation of contract in its MTD Order.

ALS was awarded additional missions. FAC ¶ 55. This is consistent with ALS's concession in the
FAC that the IDIQ Contract "functioned" from 2019 to the first quarter of 2022, resulting in four
successful projects. *Id.*; *see Willard, Sutherland & Co. v. United States*, 262 U.S. 489, 494 (1923)
(concluding that a contract that was "not enforceable" at its inception "became valid and binding to
the extent that it was performed")

ALS relies on *Willard, Sutherland & Co.* to argue that "Defendant(s) only paying for services
rendered is not enough to save the contract or minimum [30% workshare] requirement." Opp'n at
16. But this case does not support ALS's conclusion. There, the Supreme Court held that "for lack of
consideration and mutuality, the contract [at issue] was not enforceable." *Willard, Sutherland & Co.*,
262 U.S. at 493. It appears that ALS leans on this part of the Supreme Court's holding. The Supreme
Court, however, held in the immediately subsequent paragraph that "[w]hile the contract at its
inception was not enforceable, it became valid and binding to the extent that it was performed." *Id.*
at 494; *see* FAC ¶ 113 ("The contract functioned as intended . . . by the Parties for two years . . . .").
Ultimately, the Supreme Court affirmed the Court of Claim's conclusion that the appellant was not
entitled to recover. *Willard*, *Sutherland & Co.*, 262 U.S. at 494. As such, it does not appear to the
Court that *Willard, Sutherland & Co.* advances ALS's argument.

As before, ALS relies on the Federal Acquisition Regulation ("FAR") to argue that the Court
should find the IDIQ Contract imposing an obligation on Defendants to award 30% of the
workshare. Opp'n at 13. But ALS has not remedied the defect identified in the MTD Order—that
"[i]t is far from clear to the Court that [] rewriting of the IDIQ Contract to make it comply with [the]
FAR is appropriate, and ALS has not shown that it is." MTD Order at 16. Neither the FAC nor the
Opposition addresses this point. As such, the Court's finding as to ALS's reliance on the FAR
remains the same.

Insofar as the Court found—and again finds—that the workplace provision is unambiguous,
ALS's remaining arguments based on "context" or other extrinsic evidence do not pass muster. *See*
Opp'n at 7 (arguing that the Court should consider the parties' bargaining positions), 9–11
(referencing the Teaming Agreement, what Defendants' employee Debbie Williams said, and what
Waterman wrote in an email), 11–12 (contending that "it defies logic [that] ALS would agree to give

1   Defendants a license to use its intellectual property . . . but not secure some sort of guaranteed return

2   for itself").

3          For the foregoing reasons, the Motion is GRANTED as to the breach of contract cause of

4   action with respect to Defendants' alleged failure to meet a purported 30% minimum workshare

5   requirement. Dismissal shall be without leave to amend, as the Court has found that this claim fails

6   twice. *See Manzarek*, 519 F.3d at 1031 ("Dismissal without leave to amend is improper unless it is

7   clear . . . that the complaint could not be saved by any amendment.").

8          **ii.    ALS Has Not Adequately Pleaded Its Claim for Breach of Contract (First Cause of Action) Based on Defendants' Misuse of Its Intellectual Property Beyond the Scope of the Licensing Provision.**

9

10         In the MTD Order, the Court found that ALS had adequately pleaded its claim for breach of

11  contract based on Defendants' misuse of ALS's intellectual property. The Court so found based on

12  Defendants' offer to sell ALS's Power Control Module ("PCM") and the approach the court in

13  *Macom Tech. Sols. Holdings, Inc. v. Infineon Techs. AG*, 2016 WL 6495373, *22 (C.D. Cal. Oct. 31,

14  2016), *aff'd in relevant part*, 881 F.3d 1323 (Fed. Cir. 2018), adopted—that ALS, in context, alleged

15  "an implied negative covenant" in the parties' licensing agreement. *See* MTD Order at 16–17

16  (addressing Defendants' arguments that (1) ALS had not adequately alleged any use of ALS's

17  intellectual property beyond that allowed by the IDIQ Contract and (2) the IDIQ Contract does not

18  actually prohibit using the intellectual property as alleged). This time, Defendants make two new

19  arguments regarding ALS's breach of contract claim based on Defendants' alleged misuse of ALS's

20  intellectual property: (1) ALS has failed to allege whether there are any "trade secrets"[6] and (2) ALS

21  has not alleged any harm or damages. Mot. at 10. The Court finds that ALS has not adequately

22  pleaded harm but that an amendment may cure the defect.

23         ALS does not need to allege that there are trade secrets to assert a claim for breach of

24  contract under the IDIQ Contract's licensing provision. "To prevail on a cause of action for breach

25

26  _____

27  [6] Defendants guide the Court to Section V.G of its Motion to argue that ALS has failed to allege the existence of trade secrets. But the cited section discusses declaratory relief; it is Section V.H that analyzes whether ALS has adequately identified its trade secrets. As such, the Court will consider the arguments laid out in Section V.H of the Motion.

28

of contract, the plaintiff must prove (1) the contract, (2) the plaintiff's performance of the contract or

excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the

plaintiff." *Richman v. Hartley,* 224 Cal. App. 4th 1182, 1186 (2014). Here, ALS sufficiently alleged

a contract: the licensing provision of the IDIQ Contract. ECF No. 42-2 at 22 (Section H.8,

Intellectual Property); FAC ¶ 118 (referencing the licensing provision). The Court notes that the

licensing provision is not limited to trade secrets; it broadly encompasses, among other information,

"pre-existing inventions, technology, designs, . . . , and other information or materials . . . ." ECF

No. 42-2 at 22. Moreover, Defendants provide no authority requiring ALS to specifically identify its

trade secrets in order to allege a claim for breach of contract. *See* Mot. at 10 (relying instead on

CUTSA and DTSA). As such, the Court finds that ALS is not obligated to allege its trade secrets for

its breach of contract claim under the IDIQ Contract's licensing provision.[7]

  But the Court finds that ALS has not sufficiently alleged harm. Although ALS alleges that it

has been damaged in an amount "conservatively estimated to exceed $15,000,000," FAC ¶ 122, ALS

does not allege under what recovery theory, e.g., lost profits, it seeks this amount, nor does it

otherwise describe how it was damaged. Because the alleged amount is speculative, the claim for

breach of contract for misuse of ALS's intellectual property fails. *See Vestar Dev. II, LLC v. Gen.
Dynamics Corp.*, 249 F.3d 958, 962 (9th Cir. 2001) (finding the plaintiff's allegation for damages for

$48,000,000 "too speculative" in the motion to dismiss stage for breach of contract claim).

  For these reasons, the Motion is GRANTED as to breach of contract cause of action with

respect to misuse of intellectual property. ALS is granted leave to amend and provide plausible

factual allegations regarding harm in support.

### iii. ALS Has Not Adequately Pleaded a Claim for Breach of Contract (First Cause of Action) Based on Defendants' Breach of the Confidentiality Provision.

  In the FAC, ALS adds a new allegation that Defendants breached the confidentiality

provision of the IDIQ Contract. FAC ¶ 120. Defendants seek to dismiss this claim on the ground that

---

[7] ALS has sufficiently alleged its performance, FAC ¶ 65, and Defendants' breach, *id*. ¶¶ 78–83, 118.

9

ALS has not "allege[d] what information Defendants supposedly disclosed to which 'other third parties.'" Mot. at 10. The Court touched on this argument in the MTD Order. *See* MTD Order at 16–17 (finding ALS's allegation about Defendants' offer to sell the PCM to customers unrelated to the execution of the IDIQ Contract sufficient for the claim). Nevertheless, the Court finds that ALS has not adequately alleged harm.

Drawing reasonable inferences in ALS's favor, ALS has adequately pleaded that Defendants exceeded the IDIQ Contract's confidentiality provisions. Defendants have offered the PCM, which ALS alleges is a trade secret, for sale since at least December of 2021. *See* FAC ¶¶ 86, 89. Defendants also listed ALS's Aquila Deck Adapter and the '114 Patent as "Parsons Product[s]" on their website. *Id*. ¶ 83; *but see id*. ¶ 66 (quoting the IDIQ Contract's confidentiality provision, which prohibits disclosure on, among other things, publicity and advertising materials). These allegations are sufficient to overcome Defendants' challenge. Moreover, the Court does not find that ALS is obligated to provide further specificity on to whom Defendants disclosed ALS's confidential information, and Defendants provide no binding authority that compels this Court to find otherwise.

The Court, however, finds that ALS has not alleged harm. As discussed above, ALS's allegation that it has been damaged for at least $15,000,000, *id*. ¶ 122, is speculative.

As such, the Court GRANTS the Motion as to this claim based on Defendants' breach of the confidentiality provision. ALS is granted leave to amend.

**B. ALS Has Not Sufficiently Alleged a Claim for Breach of Implied Joint Venture/Partnership Agreement (Second Cause of Action).**

In its FAC, ALS adds a new allegation that Defendants breached an implied joint venture/partnership agreement. Defendants seek to dismiss this claim on the ground that the IDIQ Contract expressly prohibits a joint venture/partnership agreement. Mot. at 11. In response, ALS argues that (1) the IDIQ Contract does not cover the scope of the parties' partnership agreement; (2) Defendants "publicly, and unequivocally, announced the creation of the partnership in a press release dated March 4, 2020," (3) even if the IDIQ Contract is found to have covered the agreement, the implied partnership arose "at a different time" than the IDIQ Contract; and (4) ALS may plead in the alternative and thereby survive the challenge. Opp'n at 15–17. This claim fails.

As an initial matter, it is clear that the IDIQ Contract expressly covers the same relationship that ALS seeks to characterize as an implied venture/partnership. As ALS must concede, the IDIQ Contract states that it "*does not create* any employer-employee, agency, joint employer, *joint venture or partnership* relation between" the parties. ECF No. 42-2 at 15 (under the heading "Independent Contractor Relationship") (emphases added). This provision makes it plain that the relationship between the parties is that of "independent contractor," not joint venture or partnership. *See* ECF No. 42-2 at 21. And the integration clause makes clear that the relationship leading up to the contract is all captured by the IDIQ Contract. *See* ECF No. 42-2 at 21 ("There are no terms, conditions, or provisions, whether oral or written, between the parties hereto, other than those herein contained."). Because the IDIQ Contract expressly establishes that there is an independent contractor relationship between the parties, and not an implied venture/partnership, the Court finds that ALS's claim for breach of implied agreement fails on this basis.[8] *See Retired Emps. Assn. of Orange Cnty., Inc. v. Cnty. of Orange*, 52 Cal. 4th 1171, 1181 (2011) (holding that "the law does not recognize implied contract terms that are at variance with the terms of the contract as expressly agreed.").

In view of this, at the hearing, counsel for ALS asserted that this claim rested on a two alternative theories: first, that the parties' course of conduct *prior* to the IDIQ contract negotiations established an implied venture/partnership which, by law, could not be extinguished with the IDIQ Contract, Opp'n at 16 (citing Cal. Corp. Code § 16801); second, that if the IDIQ Contract was construed not to include a 30% workshare requirement, it failed for lack of consideration, and the parties' relationship *defaulted* to an implied venture/partnership.

In support of the first theory—that the parties established an implied venture/partnership prior to contract negotiations—ALS points generally to "several announcements publicly discussing

---

[8] Moreover, ALS's argument that it is merely pleading in the alternative is similarly unavailing. ALS relies on *Lever Your Bus. Inc. v. Sacred Hoops & Hardwood, Inc*., No. 5:19-cv-01530-CAS(KKx), 2020 WL 2465658 (C.D. Cal. May 11, 2020)—which Defendants also cite, Mot. at 10—but this case does not advance ALS's view. *See Lever Your Bus. Inc*., 2020 WL 2465658, at *4 ("[T]here is no cause of action for implied contract where there exists between the parties a valid express contract covering the same subject matter."). Having found that the IDIQ Contract's Independent Contractor Relationship provision expressly and explicitly covers the very subject matter at issue, the Court finds that ALS's "pleading in the alternative" argument in support of its breach of an implied joint venture/partnership agreement claim fails.

the 'Partnership,'" FAC ¶ 125, but the only specific announcement it alleges in the FAC—a press release about the parties' "strategic space partnership," *id.*—occurred *after* the IDIQ Contract and therefore does not support the idea that a partnership was established and announced *prior* to the IDIQ Contract negotiations began. *Compare id.* ¶ 54 ("The IDIQ Subcontract Agreement was eventually executed on July 1, 2019.") *and* ECF No. 42-2 at 15 (the "Independent Contractor Relationship" provision) *with* ECF No. 42-3 (press release dated March 4, 2020). As such, this argument does not compel this Court to find that a partnership relationship between the parties has been adequately alleged. Therefore, in the absence of any other plausible allegations, the Court finds that ALS has not plausibly alleged that the parties formed a legally binding partnership prior to the IDIQ Contract.

The second theory—that the IDIQ Contract "defaults to" a 50%-50% implied venture/partnership if the Court finds no 30% workshare requirement—also fails. The Court has already addressed that ALS has failed to establish that the absence of the 30% workshare requirement—or any other reason—means that the IDIQ Contract fails for lack of consideration. Section I.A.i, *supra*. Since the IDIQ Contract is valid, the Court does not need to reach the question of whether a contract that fails for lack of consideration "defaults to" a 50%-50% implied venture/partnership and should be treated as such.

Because ALS has failed to establish that it has properly alleged the existence of an implied venture/partnership under any theory, the Motion is GRANTED as to the second cause of action breach of implied joint venture/partnership agreement. This claim will be dismissed without leave to amend, as further amendments would be futile in light of ALS's continued failure to assert any additional facts in support of this claim.

### C. ALS Has Adequately Pleaded Its Claim for Fraud (Third Cause of Action).

The Court previously found that ALS adequately alleged its claim for fraudulent inducement based on Defendants' pre-IDIQ Contract conduct.[9] MTD Order at 18–19 (relying on Waterman's

---

[9] Fraud and fraudulent inducement, which ALS raised in the initial Complaint, ECF No. 1, share the same elements. *See Engalla v. Permanente Med. Grp., Inc.*, 15 Cal.4th 951, 974 (1997) ("The elements of fraud . . .

1  December 27, 2018 email, predating the final negotiations for the IDIQ Contract); *see* FAC ¶¶ 46, 50

2  (Waterman's email predates the proposal submitted to the U.S. Air Force, and the final negotiations

3  began after Defendants were awarded the LMSI Contract). In response to the new allegations in the

4  FAC that ALS has made for its breach of contract claim, FAC ¶¶ 110, 111, Defendants argue that

5  ALS cannot allege justifiable reliance and harm because it was "aware" of Defendants' attempts to

6  change the IDIQ Contract's language during negotiations.[10] Mot. at 12. The Court does not find that

7  this is what these paragraphs allege.[11, 12]

8      For clarity, as this Court previously found, ALS has adequately pleaded reliance based on

9  Defendants' pre-IDIQ Contract conduct. ALS alleges in the FAC—as it did in the initial

10  Complaint—that before the parties executed the IDIQ Contract, Defendants acted in ways that

11  induced ALS to believe that the IDIQ Contract contained a 30% workshare provision and/or that the

12  Defendants would adhere to one. *See id*. ¶¶ 46 (describing Waterman's December 2018 email

13  containing "30% labor workshare" next to ALS's name), 52–53 (the parties entered into a Letter

14  Subcontract Agreement, under which Defendants paid ALS $40,000 to perform work). ALS alleges

15  that it relied on Defendants' statements regarding 30% workshare and chose to spend man hours and

16  pursue the LMSI contract with Defendants. *Id*. ¶ 38. Such allegations permit a reasonable inference

17  ────────────────────

18  are: (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or
   'scienter'); (c) intent to defraud, i.e. to induce reliance; (d) justifiable reliance; and (e) resulting damage.")
19  (internal quotation marks omitted); MTD Order at 18 (citing *Engalla* for elements of fraudulent inducement).

20  [10] Because Defendants focus only on justifiable reliance and damage in its Motion, and in light of the MTD
   Order finding that the other elements are satisfied, the Court will evaluate only whether ALS has sufficiently
21  alleged justifiable reliance and damage.

22  [11] During the hearing, Defendants, focused on ALS's allegations of Defendants' conduct during negotiations,
   argued that in light of the facts of this case, the IDIQ Contract's integration clause precludes reliance. Even if
23  this claim was based on the allegations of Defendants' conduct during negotiations, integration clauses, as
   Defendants conceded, do not automatically preclude reliance, and Defendants have not provided any binding
24  authority holding that integration clauses necessarily defeat fraud claims. Moreover, Defendants' integration
   provision argument during the hearing relied solely on the newly added "awareness" allegations and not the
25  other allegations contained in the FAC that led the Court to find reliance in its prior Order. Accordingly, the
   Court's finding that ALS has adequately alleged reliance remains unchanged.

26  [12] Contrary to what it has alleged in the FAC, ALS engaged with Defendants' challenge based on paragraphs
   110 and 111 and asserted that Defendants' conduct during negotiations can be a basis for its fraud claim. If
27  ALS wishes to proceed on this ground in the next amended complaint, it may do so. The Court notes,
   however, that the FAC's allegations of fraud based on Defendants' conduct during negotiations do not satisfy
28  Rule 9(b)'s heightened standards.

to be drawn in ALS's favor at the pleadings stage. Moreover, the reasonableness of ALS's reliance is a question of fact. *See City Sols. v. Clear Channel Communs., Inc.*, 365 F.3d 835, 840–41 (9th Cir. 2004) ("Except in the *rare case* where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact.") (emphasis in original).

ALS has also adequately pleaded damages. ALS has sufficiently alleged the bases upon which it seeks damages for its fraud claim: (1) ALS gave Defendants access and license to use its trade secrets, patents, and other technologies and (2) ALS invested and expanded its business to "honor" the increased workload under the IDIQ Contract. FAC ¶ 138. Such allegations withstand challenge at the pleadings stage.

Thus, the Motion is DENIED as to the cause of action for fraud.

### D. ALS Has Not Adequately Pleaded Its Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing (Fourth Cause of Action).

Whereas ALS had previously advanced this claim on the basis that Defendants refused to complete Past Performance Evaluation Forms, *see* ECF No. 31 at 25 (acknowledging that its two other grounds—violation of the 30% workshare provision and violation of the licensing provision—are "redundant" of its breach of contract claim); MTD Order at 19 (noting that ALS conceded that the other theories it had asserted were "improper"), this time, ALS advances on all three grounds for breach of the covenant of good faith and fair dealing: (1) failure to provide ALS 30% of the workshare; (2) advertisement and offer for sale ALS's intellectual property to third parties; and (3) refusal to complete Past Performance Evaluation Forms for the ALS to obtain a General Services Administration ("GSA") Oasis Plus Award. FAC ¶ 144. Previously, the Court found that the claim was valid on the third ground but did not consider the sufficiency of the allegations regarding damages. *See* MTD Order at 19. Defendants argue that ALS has not sufficiently alleged harm, and the Court agrees. The Court finds none of ALS's three theories viable.

For a claim for breach of the implied covenant of good faith and fair dealing, the following must be alleged: (1) the parties entered into a contract; (2) plaintiff did all, or substantially all of the significant things that the contract required (or was excused from performance); (3) defendant acted

in such a way that prevented plaintiff from receiving the benefit under the contract; (4) defendant did not act fairly and in good faith; and (5) plaintiff was harmed. Jud. Council of Cal. Civ. Jury Instructions ("CACI") No. 325 (Breach of Implied Covenant of Good Faith and Fair Dealing—Essential Factual Elements). "If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990).

The first ground—which the Court had not evaluated previously—fails because, as discussed above, the IDIQ Contract precludes a finding of a contract between the parties obligating Defendants to assign 30% of the workshare to ALS. *See* Section I.A.i, *supra*; *cf. Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1031 (1992) (a claim for a breach of the covenant of good faith and faith "rests upon the existence of some specific contractual obligation."). Absent a contractual obligation to assign 30% of the workshare to ALS, the Court finds that ALS has not adequately alleged a breach of the implied covenant of good faith and fair dealing based on its understanding of the workshare provision. Having so found twice now, the Court does not see that any further amendment will cure this defect and therefore denies leave to amend.

The second ground—which the Court had not considered before—likewise fails because ALS has not sufficiently pleaded harm from Defendants' advertisement and offer for sale of ALS's intellectual property. ALS has alleged a contract: the confidentiality provision of the IDIQ Contract, which prohibits disclosure of the parties' "confidential or proprietary information" "to any third party," including through "publicity and advertising material." FAC ¶ 66. ALS has pleaded its performance. *Id*. ¶ 65 ("ALS granted Defendants an irrevocable . . . right and license to use . . . ALS'[s] pre-existing inventions . . . ."). ALS has also pleaded that Defendants did not act in good faith by alleging that Defendants exceeded the scope of the confidentiality provision by not only disclosing and offering for sale ALS's intellectual property, *id*. ¶ 90, but also by distributing materials that included ALS's proprietary information and presenting them as their own, *e.g.*, *id*. ¶¶ 78–79, 81–83. Through such allegations, ALS has adequately pleaded that its claim for breach of the

implied covenant of good faith and fair dealing goes "beyond the statement of a mere contract breach." *Cf. Careau & Co.*, 222 Cal. App. 3d at 1395. ALS, however, has not alleged how it was harmed beyond what appears to be a speculative monetary sum. *Id.* ¶ 145 (estimating damage in an amount over $15,000,000). As such, the Court finds that ALS's second theory for breach of the implied covenant of good faith and fair dealing is not viable. The Court grants leave to amend the FAC to add sufficient allegations of harm.

The third ground—against which Defendants advance a new argument—also fails because ALS has not sufficiently pleaded harm from Defendants' refusal to complete the Past Performance Evaluation Forms. For clarity, the Court stands by its previous finding that Defendants had an obligation to complete the evaluation forms. Defendants argue that they "could not have entered past performance evaluations" into the Contractor Performance Assessment Reporting System ("CPARS") because neither of them is an "Assessing Official"—"a Government employee" "responsible who for preparing, reviewing, signing, and processing the evaluations." *See* Mot. at 14 (quoting from GUIDANCE FOR THE CONTRACTOR PERFORMANCE ASSESSMENT REPORTING SYSTEM (CPARS) ("CPARS Guidance") § 3.5.4 (July 2024), https://www.cpars.gov/cparsweb/assets/documents/CPARS-Guidance.pdf). But this information is beyond the four corners of the FAC, and Defendants have not requested this Court take judicial notice of it. However, the Court agrees with Defendants that ALS alleges only "speculative" harm. *See* Opp'n at 21 ("ALS . . . *would have* received additional contracts and work.") (emphasis added). ALS's reliance on *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051 (9th Cir. 1999) does not compel a different finding. *Cf. id.* at 1059 (finding alleged harm not speculative because the alleged injury flew "directly" from the defendant's conduct). Accordingly, the Court finds that this basis for this claim fails. The Court grants leave to amend the FAC as to the facts that give rise to finding more than speculative harm.

Separately, Defendants ask the Court to dismiss ALS's request for punitive damages. Because ALS has not properly alleged that it is entitled to any damages, the Motion is GRANTED as to ALS's request for punitive damages. *Cf. State Farm Auto. Ins. Co. v. Coates*, 933 F.2d 1015, 1991 WL 89977, at *1 ("[I]t need not appear that the plaintiff can obtain the *specific* relief demanded as

1    long as the court can ascertain from the face of the complaint that *some* relief can be granted.")

2    (quoting *Doe v. United States Dep't of Justice*, 753 F.2d 1092, 1104 (D.C. Cir. 1985).

3        The Motion is GRANTED without leave to amend as to ALS's theory based on the 30%

4    workshare provision, as the Court does not see that another round of amendment will cure the above-

5    identified defects. *See Manzarek*, 519 F.3d at 1031. The Motion is GRANTED with leave to amend

6    as to the remaining two grounds.

7        **E.  ALS Has Not Adequately Pleaded Its UCL Claim (Fifth Cause of Action).**

8        Previously, the Court found that ALS's UCL claim fell short for failing to allege loss of

9    money or property because of Defendants' sale of ALS's intellectual property on their website.

10   MTD Order at 20–21. ALS has attempted to address this defect and simultaneously raise a new

11   theory under the UCL's fraudulent prong. But the FAC has not cured the previously identified

12   defect, and the fraudulent business practices theory fails. As such, the Court's finding remains

13   unchanged.

14       Like last time, ALS raises several arguments as to why the UCL claim should survive. *See*

15   Opp'n at 22 ("(1) failure to satisfy their obligation to assign a 30% workshare to ALS, (2) breach of

16   contract in selling ALS's products on their website, (3) failure to submit positive Past Performance

17   Evaluations for ALS, and (4) fraudulent business practices."); FAC ¶¶ 149–52 (alleging the second,

18   third, and fourth of the above-listed reasons as bases for ALS's UCL claim). Because the Court has

19   found that there was no obligation to assign a 30% workshare to ALS, Section I.A.i, *supra*, the Court

20   evaluates whether ALS's UCL claim survives under the second, third, and fourth theories. These

21   theories fall short.

22       ALS has again failed to adequately allege that it lost money or property because of

23   Defendants' conduct. The FAC is silent on whether ALS lost money or property because of

24   Defendants' offer to sell its intellectual property. *See, e.g.*, FAC ¶ 90 (alleging only that ALS's

25   intellectual property was offered for sale and not whether a sale was made); *see* Opp'n at 22 (arguing

26   that Defendants "likely sold" ALS's products). ALS's allegations of harm from Defendants' refusal

27   to complete the Past Performance Evaluation Forms are conclusory. *See id.* at 21 ("ALS . . . would

28   have received additional contracts and work."). Such allegations or arguments are still insufficient.

1   *See* MTD Order at 21 ("ALS does not allege that it lost any sales or has suffered any diminution of

2   goodwill.").

3   Similarly, ALS's argument in support of its claim under the "fraudulent" prong of the UCL

4   does not withstand scrutiny. Although ALS argues that "Defendants' fraudulent business practices

5   resulted in damages to ALS because it took business which otherwise would have gone to ALS, and

6   caused ALS to shift its entire business model away from other profitable areas," Opp'n at 22, the

7   FAC does not contain any allegation of what business it *would have* had if Defendants acted

8   otherwise or what other less profitable business model it had to embrace.[13] Absent such allegations,

9   the Court finds that ALS does not have standing for a UCL claim.[14]

10  The Motion is therefore GRANTED as to this cause of action without leave to amend, as

11  ALS has failed to establish a UCL claim twice. *See Manzarek*, 519 F.3d at 1031.

12  **F. ALS Has Not Adequately Pleaded Its Declaratory Relief Claim (Sixth Cause of
13      Action).**

14  ALS again seeks a judicial determination that the IDIQ Contract contains a 30% minimum

15  guaranteed workshare. As it did in the MTD Order, the Court finds that this claim fails.

16  For a court to consider a claim for declaratory relief there must be an "actual controversy"

17  between the parties. *Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393 (9th Cir. 1982).

18  In light of the Court's finding that the IDIQ Contract does not contain a 30% minimum

19  guaranteed workshare, Section I.A.i, *supra*, this claim fails. There is no longer any active

20  controversy between the parties in light of the Court's rulings. To the extent that there was a dispute

21  as to the specific form of relief that ALS sought in the FAC as pleaded, that dispute is now resolved.

22

23  _____

24  [13] During the hearing, ALS's counsel informed the Court that in further support of the UCL claim, he could
    speak with his client to provide more information about loss of potential business. But the Court believes that
25  further amendment will be futile, especially in light of ALS's failure to adequately allege this claim twice.

26  [14] For clarity, the Court does not accept Defendants' argument that ALS must have shown "not only that it
    lost money or property, but also that the money or property was acquired by [Defendants]." Mot. at 16 (citing
27  *Sharpe v. Puritan's Pride, Inc.*, 466 F. Supp. 3d 1066, 1071 (N.D. Cal. 2020)). The California Supreme Court
    in *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, which the court in *Sharpe* cited, held that a plaintiff's
28  economic injury "without any corresponding gain by the defendant" nevertheless "satisf[ies] the plain
    meaning of [the UCL's] 'lost money or property' requirement." *Kwikset Corp.*, 51 Cal. 4th at 336.

1    Thus, the Motion is GRANTED as to the claim for declaratory relief without leave to amend.

2    **G. ALS Has Not Sufficiently Alleged a Claim for Misappropriation of Trade Secrets**
3    **under the California Uniform Trade Secrets Act (Seventh Cause of Action).**

4    In its FAC, ALS adds a new claim for misappropriation under the CUTSA. Defendants argue

5    that ALS's misappropriation claim under the CUTSA should be dismissed because ALS has not

6    "alleged which of its alleged information is supposedly a 'trade secret' versus what is in a patent. . . .

7    In fact, ALS completely comingles the two—referring to 'trade secrets' and 'patents' together." Mot.

8    at 19. The Court finds that further specificity is needed to determine which of ALS's alleged trade

9    secrets meet the definition of a trade secret.

10    To prevail under the California Uniform Trade Secrets Act, the following must be satisfied:

11    (1) the plaintiff owned a trade secret, (2) the defendants acquired, disclosed, or used the plaintiffs'

12    trade secret through improper means, and (3) the defendant's actions damaged the plaintiff. *Sargent*

13    *Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1665 (2003) (citing Cal. Civ. Code § 3426.1).

14    In turn, a trade secret is information that "(1) [d]erives independent economic value, actual or

15    potential, from not being generally known to the public or to other persons who can obtain economic

16    value from its disclosure or use, and (2) [i]s the subject of efforts that are reasonable under the

17    circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). In other words, a trade secret "is

18    valuable because it is unknown to others." *DVD Copy Control Assn. v. Bunner*, 116 Cal. App. 4th

19    241, 251 (2004).

20    Under the DTSA, a trade secret is similarly defined as

21    all forms and types of financial, business, scientific, technical, economic, or
22    engineering information, including patterns, plans, compilations, program devices,
        formulas, designs, prototypes, methods, techniques, processes, procedures, programs,
23    or codes, whether tangible or intangible, and whether or how stored, compiled, or
        memorialized physically, electronically, graphically, photographically, or in writing
24    if—

25    (A) the owner thereof has taken reasonable measures to keep such information
26    secret; and

27    (B) the information derives independent economic value, actual or potential,
        from not being generally known to, and not being readily ascertainable through

28

19

proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3). "Confidentiality provisions constitute reasonable steps to maintain secrecy." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 660 (9th Cir. 2020).

ALS has not sufficiently alleged the existence of its trade secrets. The FAC lists five categories of trade secrets: (1) the designs and specifications for the Aquila Deck Adapter, (2) the designs and specifications for the Aquila Standard Adapter, (3) the designs and specifications for the 2.6M Dual-Manifest Adapter Fitting, (4) the designs for the Aquila Multi-manifest System, and (5) the PCM. FAC ¶¶ 70 (listing the first four as trade secrets over which ALS purportedly asserted ownership in its Data Rights Assertion document), 86 ("the PCM is a Trade Secret owned by ALS"). ALS alleges that it "derives substantial benefit by maintaining the confidentiality of the Trade Secrets in its database." *Id*. ¶ 71. ALS also describes the ways in which it keeps the confidentiality of this information. *See id.* ¶¶ 73 (listing, among other things, restricting access to physical servers, requiring coded passwords, and imposing strict confidentiality standards as its "careful, substantial, and reasonable steps to safeguard the secrecy of its Trade Secrets"), 87 ("ALS safeguarded [the PCM] from disclosure by clearly placing ALS Proprietary statement and markings on all documents and communications with Parsons."). But with respect to the question of any similarities between the asserted trade secrets and the '114 Patent, which is properly considered as part of the consideration of the confidentiality factor under the CUTSA and the DTSA, ALS's allegations are insufficient. During the hearing, Defendants argued that ALS has conflated at least one of its alleged trade secrets (Aquila Multi-manifest System) with the '114 Patent. *See* ¶ 70 ("This unique hardware, software and operations [Aquila Multi-manifest System] are combined into systems with flight proven hardware (*like the APSU* ['114 Patent]. . . .") (emphasis added). The Court agrees and notes that ALS has not alleged exactly which feature of its property is a trade secret, i.e., bundling and interfacing versus designs. As such, the Court GRANTS the Motion with leave to amend.[15]

_____

[15] As discussed at the hearing, prior to the filing of an amended complaint, ALS shall file a trade secret information statement. The Court will issue a separate Order detailing what should be included in a trade secret information statement.

### H. ALS Has Not Sufficiently Alleged a Claim for Misappropriation of Trade Secrets under the Defend Trade Secrets Act (Eighth Cause of Action).

The Court finds that the analysis for ALS's claim for misappropriation under the CUTSA applies to its analysis under the DTSA. *See InteliClear, LLC*, 978 F.3d at 657 (observing that "[c]ourts have analyzed [the federal FTSA and the state CUTSA] claims together because the elements are substantially similar").

Accordingly, the Court GRANTS the Motion as to ALS's claim under the DTSA with leave to amend.

### I. ALS Has Not Adequately Pleaded Its Unjust Enrichment Claim (Ninth Cause of Action).

ALS raises a claim for unjust enrichment for the first time in the FAC. This claim fails.

"There is no cause of action in California for unjust enrichment. Unjust enrichment is synonymous with restitution." *Levine v. Blue Shield of Cal.*, 189 Cal. App. 4th 1117, 1138 (cleaned up). Similarly, under the DTSA, unjust enrichment is available as a type of remedy, not as a standalone cause of action. *See* 18 U.S.C. § 1836(b)(3)(B)(i)(II) (permitting awarding "damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss").

As such, the Motion is GRANTED without leave to amend as to ALS's claim for unjust enrichment based on Defendants' alleged misappropriation in violation of the CUTSA and the DTSA. ALS may, however, seek unjust enrichment as a remedy for other claims.

### II.    <u>Conclusion</u>

For the reasons stated herein, the Court ORDERS as follows:

1. The RJN is GRANTED.

2. The Motion is GRANTED IN PART.

    a.   The following claims are DISMISSED WITHOUT LEAVE TO AMEND:

           i.   ALS's breach of contract claim (first cause of action) against Defendants with respect to the failure to meet a purported 30% minimum workshare requirement;

ii. ALS's claim for breach of implied joint venture/partnership agreement (second cause of action);

iii. ALS's breach of the implied covenant of good faith and fair dealing (fourth cause of action) with respect to the failure to meet a purported 30% minimum workshare requirement;

iv. ALS's UCL claims (fifth cause of action);

v. ALS's declaratory relief claim (sixth cause of action); and

vi. ALS's claim for unjust enrichment (ninth cause of action).

b. The following claims are DISMISSED WITH LEAVE TO AMEND:

i. ALS's breach of contract claim (first cause of action) against Defendants with respect to the licensing provision;

ii. ALS's breach of contract claim (first cause of action) with respect to the confidentiality provision;

iii. ALS's breach of the implied covenant of good faith and fair dealing (fourth cause of action) with respect to misuse of ALS's intellectual property;

iv. ALS's breach of the implied covenant of good faith and fair dealing (fourth cause of action) with respect to failure complete performance evaluations;

v. ALS's request for punitive damages under the breach of the implied covenant of good faith and fair dealing (fourth cause of action);

vi. ALS's misappropriation of trade secrets claim under the CUTSA (seventh cause of action); and

vii. ALS's misappropriation of trade secrets claim under the DTSA (eighth cause of action).

c. ALS's fraud claim may proceed.

3. ALS shall file a trade secret information statement. The Court will issue a separate Order detailing what should be included in a trade secret information statement.

1        4.  ALS is granted leave to file an amended complaint. The Court's separate Order regarding

2            ALS's trade secret information statement will include a timeline for the parties to file an

3            amended complaint and any responsive pleadings.

4

5    IT IS SO ORDERED.

6

7     Dated: February 25, 2025             _____

8                                     MAAME EWUSI-MENSAH FRIMPONG

9                                      United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28